689 F.2d 541
 INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS OF HOUSTON,
INC., a Texas nonprofit corporation, and Janardana
Dasa, Plaintiffs-Appellees,
v.
CITY OF HOUSTON, TEXAS, Jim McConn, Mayor, Houston, Texas,
Harry Caldwell, Chief of Police, Houston, Texas, Guy R.
Griscom, Acting Tax Assessor-Collector, City of Houston,
Texas, Defendants-Appellants.
 No. 79-3879.
 United States Court of Appeals,
Fifth Circuit.
 Unit A*
Oct. 18, 1982.
 
 John E. Fisher, Asst. City Atty., Marsha R. Kaufman, Asst. City Atty., Houston, Tex., for defendants-appellants.
 Nick D. Nicholas, Houston, Tex., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Texas.
 Before WISDOM, POLITZ, and SAM D. JOHNSON, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 "Public awareness of abuses in the administration of charitable fund raising practices has increased over the past twenty years."[1] Also during this time, as is reflected in the case law, some Krishna followers and others soliciting funds for charitable purposes, particularly in airports, parks, and public gatherings, have pushed their overzealous solicitation to the point of causing undue annoyance to the public. Many local governmental authorities have reacted by adopting regulations requiring the licensing of solicitors for charitable or religious purposes. These regulations have generated a large body of litigation based on alleged violations of the first and fourteenth amendments.[2] It is no easy task to draft a facially neutral and neutral-content ordinance consistent with the first and fourteenth amendments that will protect the public from fraud and harassment in solicitation of funds. "(A) regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement of governmental neutrality if it unduly hinders the free exercise of religion", Wisconsin v. Yoder, 1972, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15, or it may "unduly ... intrude upon the rights of free speech", Schaumberg v. Citizens for a Better Environment, 1980, 444 U.S. 620, 632, 100 S.Ct. 826, 833, 63 L.Ed.2d 73, reh. denied, 445 U.S. 972, 100 S.Ct. 1668, 64 L.Ed.2d 250.
 
 
 2
 Article IV of the Houston Municipal Code, "Solicitation of Funds for Charitable Purposes", §§ 37-41 through 37-53, enacted in 1969, required that all persons who solicit funds for "charitable or welfare" purposes must first obtain a "license" from the city tax assessor-collector. The ordinance conditioned issuance of a license upon the applicant's furnishing extensive information and upon the approval of the assessor-collector who was charged with the duty to "examine the application and to make such investigation as he may deem necessary to ascertain the truth of the facts and information set out therein". The licensor was required to refuse a license where any statement in the application was "false, fraudulent or untrue". On April 2, 1979, the International Society for Krishna Consciousness of Houston, Inc. ("ISKCON" or the "Society") and, its president, Janardana Dasa, an ordained priest of the Society, filed suit against the City of Houston and certain city officials.[3] The action asked for a declaratory judgment that Article IV was unconstitutional and for a permanent injunction against enforcement of the provisions of that article, under 28 U.S.C. §§ 2201-02 and 42 U.S.C. § 1983. On May 16, 1979, apparently to correct constitutional infirmities highlighted by the complaint, the City completely revised §§ 37-41 through 37-50 of Article IV. In particular, the amended ordinance, Ordinance 78-829, substitutes a "certificate of registration" for a license and, according to the defendants, makes its issuance mandatory. The ordinance, as amended, is quoted in full as an appendix to this opinion. The plaintiffs filed an amended complaint substantially identical with their original complaint, terming the certificate of registration a "permit". The parties stipulated the facts and waived a hearing. The district court, on several grounds, held that the ordinance violated the first and fourteenth amendments and granted the plaintiffs' request for a permanent injunction. 482 F.Supp. 852 (1979). We reverse the judgment of the district court but remand the case for a hearing in the light of this opinion.
 
 I.
 
 3
 The ordinance in question makes it unlawful to solicit funds for charitable purposes without complying with certain registration, identification, and financial disclosure requirements. The person or organization desiring to solicit funds must file a registration statement with the tax assessor-collector of Houston (§§ 37-42(a), 43, 50) giving extremely detailed information. See particularly § 37-43. Within ten days after the filing, the tax assessor-collector must approve the application or explain why the statement does not provide the requisite information (§ 37-45). If the application is approved, the tax assessor-collector issues a certificate of registration (§ 37-45) and a solicitor's identification card to the applicant (§ 37-47). All solicitors must visibly display identification cards (§§ 37-42(c), 47). The certificate of registration is valid until the termination of the solicitation or for one year, whichever is less (§ 37-48). A new statement must be filed and approved to obtain a new certificate. Within 30 days after the solicitation, the registrant must file a financial statement showing the costs, amount of contributions, disbursements relating to the solicitation, and the purposes for which the funds were disbursed (§§ 37-43(j), 48). The registration fee is $5 "to compensate the City for the cost of administration" (§ 37-44). Ten identification cards are issued without a charge; additional cards may be purchased for their "actual cost" (§ 37-47). Any person who solicits funds without being duly licensed is subject to a fine of not less than $5 nor more than $200, and each act of solicitation constitutes a separate offense (§ 37-52). A fine of $25 to $200 is imposed for misrepresenting the issuance of a license to solicit as an endorsement or approval by the City (§ 37-52). The ordinance exempts solicitations by an organization from its members and solicitations on premises owned or controlled by the soliciting organization or with permission of the person who owns or controls the premises (§ 37-50). The ordinance contains a conventional savings clause (§ 12).
 
 
 4
 The parties stipulated that members of the society have not applied for a certificate of registration to solicit contributions and that some members have been prosecuted and fined for failing to obtain a permit before soliciting contributions. The parties agree that unless enjoined the City of Houston will continue to enforce the ordinance. The district court summarized its holding in the following language:
 
 
 5
 This court holds that Article IV of the Code of Ordinances violates the first and fourteenth amendments to the United States Constitution. The registration and exceptions sections contain various terms and provisions which are vague. The registration and final reporting provisions unnecessarily burden the plaintiffs' exercise of their first amendment rights. The registration, identification and reporting provisions are overbroad, and inhibit the freedom of association. The court grants plaintiffs' request for declaratory and injunctive relief, and authorizes plaintiffs to receive attorney fees and court costs.
 
 
 6
 482 F.Supp. at 857.
 
 II.
 
 7
 The parties stipulated that ISKCON "is a Texas non-profit corporation and a bona-fide religious organization". The stipulation describes the Society's ritual of Sankirtan as follows:
 
 
 8
 A fundamental religious obligation of the Society's members is to engage in the religious ritual of Sankirtan. A missionary religious practice, Sankirtan consists of speaking to members of the public about the Society's religious beliefs, disseminating religious publications by gift and sale and the soliciting of contributions from the public. The purpose of Sankirtan is three-fold: (i) to spread the Society's religious beliefs in order to save fallen souls; (ii) to financially support the Society's religious activities; and (iii) to attract new members. The funds generated by the practice of Sankirtan are used for the support of the Society.
 
 
 9
 Sankirtan involves, therefore, three elements: (1) distribution of religious publications by gift and sale, (2) proselyting by speaking to members of the public about the Society's religious beliefs, and (3) solicitation of funds to support the Society's activities. The ordinance does not affect the first two elements. Krishna devotees have complete freedom to exercise their religion by distributing their literature and otherwise spreading the society's religious beliefs. They also have complete freedom of speech to express their views and to proselyte by persuasion. The third element, solicitation of funds, is a different matter; it is circumscribed by the requirements of the ordinance.
 
 
 10
 Solicitation of contributions is a form of communication. The Supreme Court has said: "Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes-that are within the protection of the First Amendment". Schaumberg, 444 U.S. at 632, 100 S.Ct. at 833. Some of the authorities the Supreme Court referred to in that decision are Hynes v. Mayor of Oradell, 1976, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243; Thomas v. Collins, 1945, 32 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430; Murdock v. Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292; and Cantwell v. Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed.2d 1213. Continuing, the Supreme Court observed, "soliciting financial support is undoubtedly subject to reasonable regulation". 444 U.S. at 632, 100 S.Ct. at 833. "The issue", then, as the Court put it in Schaumberg, "is whether the Village has exercised its power to regulate solicitation in such a manner as not unduly to intrude upon the rights of free speech". 444 U.S. at 633, 100 S.Ct. at 834. That is a major issue here.
 
 
 11
 According to the stipulation, Krishna followers regard the ritual of Sankirtan as a "fundamental religious obligation". To the extent this religious obligation is unduly interfered with by the Houston ordinance, the interference impinges upon the plaintiffs' free exercise of religion. Wisconsin v. Yoder, 406 U.S. at 220, 92 S.Ct. at 1535. The district court did not focus on the ritualized aspect of solicitation of funds by Krishna followers but instead bracketed the free exercise of religion with freedom of speech as first amendment rights unconstitutionally burdened by the registration and reporting provisions of the ordinance.
 
 III.
 
 12
 The trial judge wrote a thoughtful, carefully researched opinion, but we conclude-with deference-that he committed a major error that infects his findings as to vagueness, procedural safeguards, and overbreadth. Those findings follow logically from the following false assumption, 482 F.Supp. at 861:
 
 
 13
 If the registration statement is to serve its purpose, then the tax assessor-collector must be expected to exercise some discretion when reading and evaluating the application. Under such circumstances, the apparently objective facts adopt subjective qualities. The tax assessor-collector must determine the accuracy and adequacy of the information provided and the explanations given.
 
 
 14
 The next logical step was to say, 482 F.Supp. at 861:
 
 
 15
 However, the ordinance lacks procedural safeguards on the exercise of discretionary power by the tax assessor-collector, in violation of the first amendment. An ordinance which restrains a person from exercising his first amendment rights prior to the actual expression is constitutionally invalid where the ordinance vests discretion in municipal officers without providing procedural safeguards. Freedman v. Maryland, 1965, 380 U.S. 51 (85 S.Ct. 734, 13 L.Ed.2d 648).
 
 
 16
 Unwilling, however, to rest the decision on Freedman, the absence of Freedman procedural safeguards in the ordinance then forced the trial judge to the conclusion, 482 F.Supp. at 862:
 
 
 17
 It is not clear whether Section 37-45 sets forth a ministerial decision-making process or a discretionary one. In that respect, Section 37-45 is vague and unconstitutional. Consequently, the court does not reach the second question of the absence of procedural safeguards.
 
 
 18
 We read the ordinance as not vesting any discretion in the tax assessor-collector; issuance of a certificate is mandatorily required within ten days after the application is filed. Section 37-45 therefore, in this respect is not vague and the plaintiffs' first amendment rights are protected without the necessity of providing Freedman safeguards.
 
 
 19
 The statute in Freedman required a motion picture exhibitor to submit film in advance of exhibition to the Maryland State Board of Censors which would approve and license the film if it "was moral and proper" and refuse a license if the film was obscene or tended "to debase or corrupt morals or incite to crime". The statute imposed no time limit on the Board to act and required no judicial participation in the censorship procedures. In substance, the Freedman decision requires "procedural safeguards designed to obviate the dangers of a censorship system". 380 U.S. at 58, 85 S.Ct. at 738. See also Southeastern Promotions Ltd. v. Conrad, 1975, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448. Here, however, the Houston ordinance provides for no judgment call on the issuance of the certificate of registration and there is therefore no censorship. The ordinance requires information only to inform the public, not to serve as the basis for an informed exercise of discretion by the issuing authority. It should be noted that even in Freedman the Court declared that "the State may require advance submission of all films, in order to proceed effectively to bar all showing of unprotected film", if the requirement is not administered "in a manner that would lend an effect of finality". 380 U.S. at 58, 85 S.Ct. at 738. Similarly, in Hynes the Court approved advance registration by solicitors without any suggestion that the fact of registration alone requires compliance with Freedman safeguards.
 
 Section 37-45 states:
 
 20
 After a review of the registration statement to determine its compliance with Section 37-43 ... the City Tax Assessor and Collector shall either issue a Certificate of Registration ... or notify the person registering that the registration statement does not comply with the requirements of Section 37-43 ... and specifically point out what information or explanation has not been furnished that is required before a Certificate of Registration can be issued.
 
 
 21
 This section of the 1979 amended ordinance radically simplified the corresponding provision of the earlier ordinance which was in effect at the time the plaintiffs filed suit. See the repealed section quoted in the margin[4] and compare it with the amended section quoted here in part and quoted in full in the appendix. The amendment deletes language authorizing the tax assessor-collector "to make such investigation as he may deem necessary to ascertain the truth." It withdraws his authority to refuse to issue a license where any statement in the application is "false, fraudulent or untrue". Significantly, the amendment eliminated the provision authorizing the issuing authority to examine the application, ascertain the truth of the information set forth, and disqualify an applicant when more than 25 percent of the funds to be collected is used for salaries, expenses, and costs of solicitation and collection. The repealed provision is exactly the regulation which the Supreme Court found to be unconstitutional in Schaumberg. The obvious purpose of the amendment was to remove any language that might be construed as giving discretionary authority, that is, censorship authority, a prior restraint in "granting or refusing a license" that can be saved from infirmity only by adequate procedural safeguards.
 
 
 22
 The ordinance before us requires the tax assessor-collector to issue the certificate of registration within ten days. Only a registrant's failure to provide the information specified in § 37-43 or to provide an explanation for an omission will lawfully justify non-issuance of a certificate. And then the issuing authority must "specifically point out what information or explanation has not been furnished". An omission may be readily corrected, therefore, without exposing the applicant to any hardship or to arbitrary prior restraint. There is no provision, explicit or implicit, for the exercise of discretion. The information sought is purely objective-names, addresses, telephone numbers, and related matters of an identifying nature. Moreover, there is no language in the ordinance giving the tax assessor-collector power to review the information for accuracy and fraud. The regulatory scheme is based on providing the general public with facts identifying the solicitors and describing the solicitation. The checks on the accuracy of the registration submitted and on the sufficiency of any explanation are the checks inherent in any sworn statement-the individual's respect for his oath and his liability for perjury.
 
 
 23
 As the district court recognized, 482 F.Supp. at 861:
 
 
 24
 (§ 37-45) appears to make the issuance of the certificate depend upon only two objective facts: (1) whether information is provided and if not, (2) whether an explanation for the failure to supply the information is provided. If this is the case, as the defendants contend, then the provision is not vague and the tax assessor-collector would not evaluate the answers given. His duty would be purely ministerial.
 
 
 25
 We read the ordinance as the defendants read it and as the court rephrased it. We bear in mind the straightforward language of new § 37-45 and we compare it with the language of the repealed section. With this guidance, and under the obligation of adopting a construction of the statute consistent with constitutionality, where it is possible to do so, even when we must scrutinize regulations affecting first amendment rights, we see no justification for changing the meaning of the section by assuming that the "registration statement would fail to serve any governmental purpose" unless the tax assessor-collector had discretionary authority. The governmental purpose is served by providing the public with information relevant to the solicitation of funds.
 
 
 26
 As pointed out, the trial judge's reasoning was that the registration and reporting provisions would serve no purpose unless the issuing authority could exercise discretion in issuing certificates of registration. He rejected the City's argument that the ordinance provided basic information to the public about fund raising for a charitable purpose, 482 F.Supp. at 864:
 
 
 27
 Providing the general public with information is not one of the enumerated government purposes which justifies regulation of religious solicitation thus, that alleged government interest is not legitimate.
 
 
 28
 The Supreme Court, however, in Schaumberg expressly approved the idea of disclosure as a legitimate less intrusive measure than a direct prohibition of solicitation. The Court said, 444 U.S. at 637-8, 100 S.Ct. at 636:Efforts to promote disclosure of the finances of charitable organizations may assist in preventing fraud by informing the public of the ways in which their contributions will be employed. Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to contribute to organizations that spend large amounts on salaries and administrative expenses.
 
 
 29
 The lack of discretion in the tax assessor-collector's ministerial duty to issue a permit within ten days vitiates the district court's holding on this alleged vagueness issue and also undermines the plaintiffs' argument on the necessity of Freedman procedural safeguards. Fernandes v. Limmer, 5 Cir. 1981, 663 F.2d 619 does not require a holding to the contrary.
 
 
 30
 The issue in Fernandes v. Limmer, as stated by the Court, "is the constitutionality of a local ordinance governing literature distribution and fund solicitation in the Dallas-Fort Worth Airport complex". 663 F.2d at 623. We have no problem here as to literature distribution or as to solicitation in a limited area such as an airport complex. In Fernandes v. Limmer the ordinance "imposed no time limits on the (Regional Airport) Board's consideration of a permit application". The ordinance granted "unbridled discretion", this Court's phrase, to the Airport Board to refuse to grant a permit for a large variety of reasons.[5] Here the tax assessor-collector has a ministerial duty to issue a permit within ten days, and he does not have the power to deny a permit for any of the reasons allowed the Dallas-Fort Worth Board, some of which blatantly vested arbitrary power in the Board.
 
 
 31
 What the Court said in Fernandes v. Limmer, 663 F.2d 619, 628 was:
 
 
 32
 Although D/FW/s regulatory ordinance purports to be content-neutral, the consequences flowing from a permit denial here are essentially the same as those addressed in Freedman : to an unsuccessful permit applicant, the unavoidable delay posed by judicial review is tantamount to an effective denial of First Amendment rights. Therefore, "(t)he Freedman principle is applicable here." 663 F.2d at 628.
 
 
 33
 In that case, because the licensing system allowed a permit to be denied for numerous reasons, some at the discretion of the Board, prompt judicial review was essential to avoid censorship.
 
 
 34
 Summarizing this phase of the case, as we read § 37-45, it is not vague, not overbroad in requiring information as to solicitation of funds for charitable purposes, and does not offend the first and fourteenth amendments by omission of Freedman procedural safeguards.
 
 IV.
 
 35
 The objective of the ordinance is to regulate, not religious belief or freedom of speech, but the solicitation of funds, which is primarily secular conduct applicable to any organization soliciting funds.[6] It so happens that in this case, as in many others, the funds are solicited for religious purposes. Nonetheless, as stated in Cantwell, the state may have a compelling interest in the reasonable regulation of a protected first amendment activity:
 
 
 36
 The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.... Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury. Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent....
 
 
 37
 310 U.S. at 305, 306, 60 S.Ct. at 904.
 
 
 38
 Although regulations affecting the first amendment must be narrowly drawn, the "Supreme Court has consistently recognized a municipality's power to protect its citizens from crime and undue annoyance by regulating soliciting and canvassing. A narrowly drawn ordinance, that does not vest in municipal officials the undefined power to determine what messages residents will hear may serve these important interests without running afoul of the First Amendment." Hynes, 425 U.S. at 617, 96 S.Ct. at 1759. A brief review of a few of the Supreme Court decisions applying this principle is helpful in considering the Houston ordinance.
 
 
 39
 In Hynes the challenged ordinance required that advance written notice be given to the local police department by any person soliciting "for a recognized charitable" purpose. In holding the ordinance unconstitutional the Court emphasized that the regulation provided no adequate explanation of what was meant by a "recognized charitable cause," a "Federal State, County, or Municipal ... cause" or "Borough Civic Groups and Organizations". In addition, the court found the ordinance to be invalid because it did not "sufficiently specify" what an applicant for a license had to do to comply with the identification requirement, and because the ordinance did not "provide explicit standards for those who apply them".
 
 
 40
 Murdock v. Pennsylvania, 1943, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 involved the distribution and sale of religious literature which, the Court said, "is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types". But, as the Court pointed out, we are not concerned here with "any question as to the validity of a registration system for colporteurs and other solicitors". 319 U.S. at 109, 110, 63 S.Ct. at 873. Moreover, "the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors." 319 U.S. at 116, 63 S.Ct. at 876.
 
 
 41
 In Heffron v. Int. Soc. for Krishna Consciousness, 1981, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed. 298 the Court sustained the constitutionality of a regulation restricting the sale or distribution of literature within a state's fairgrounds to a fixed location at a state fair. The compelling state interest was in maintaining the orderly movement of the crowd. Lesser measures, such as penalizing disorder, limiting the number of solicitors, or drafting more narrowly drawn restrictions on the location and movement of ISKCON representatives would not deal adequately with the problem.
 
 
 42
 In Schaumberg the Supreme Court had before it an ordinance banning solicitation for charitable purposes by organizations not using seventy-five per cent of their contributions for charitable purposes. The court held that the ordinance was overbroad, and therefore an unreasonable intrusion upon the rights of free speech. The Village's interests in protecting the public from "fraud, crime, and undue annoyance" are "indeed substantial, but they are only peripherally promoted by the 75-percent requirement". 444 U.S. at 636, 100 S.Ct. at 835. At the same time, as pointed out, the Court recognized that: "Efforts to promote disclosure of the finances of charitable organizations also may assist in preventing fraud by informing the public". 444 U.S. at 637-8, 100 S.Ct. at 836.
 
 
 43
 If we turn now to the Houston ordinance we find none of the vices condemned by the Supreme Court in the licensing of solicitors. There is no restriction on the distribution or sale of literature. There is no censorship. There is no limitation as to a location where solicitors may approach the public. There is no language authorizing the licensing authority to determine whether an organization is qualified to use solicitors in public places. The fee charged is nominal and could hardly cover the costs of administering the ordinance. In terms of fulfilling the City's interest in protecting its citizens from fraud and harassment, it is difficult to see what less intrusive alternative could have been adopted than the requirement of limited information on the solicitation, not the internal affairs of the soliciting organization. The best the trial court could do in the way of suggesting less intrusive measures was to suggest that citizens could "contact the person listed on the registration statement ... (and) inquire yet further at the Better Business Bureau of Houston, the State Attorney General's Office, or the Office of the Secretary of State where local charities register for tax exempt purposes". 482 F.Supp. at 864. This palpably inadequate suggestion shows the lack of feasible alternatives to the system of registration, identification of solicitors, and reporting required by the ordinance.
 
 
 44
 In short, the Houston ordinance does not facially violate freedom of speech.
 
 V.
 
 45
 Whether the disclosure and reporting provisions of the ordinance are an undue intrusion on the free exercise of religion is a different but closely related question to the effect of the ordinance on freedom of speech.
 
 
 46
 In this case, as in all other cases which have involved ISKCON, no question has been raised as to recognition of the Society as a bona fide religious organization and Sankirtan as a religious ritual. The ordinance does not refer expressly to ISKCON or to Sankirtan. Strangely enough, although the complaint alleges that the regulation prevents the plaintiffs from complying with their ritual, they do not ask for special treatment on the ground that peripatetic solicitation is part of a religious ritual.
 
 
 47
 In Heffron, Justice Brennan, joined by Justices Marshall and Stevens, considered that there was no need for the Court to have discussed Sankirtan:
 
 
 48
 Respondents' complaint based on 42 U.S.C. § 1983 (42 U.S.C.S. § 1983), alleges that Rule 6.05, on its face and as applied, violates both the Free Exercise and the Free Speech Clauses. In their brief and in oral argument, however, respondents emphasize that they do not claim any special treatment because of Sankirtan, but are willing to rest their challenge wholly upon their general right to free speech, which they concede is identical to the right enjoyed by every other religious, political, or charitable group. Tr. of Oral Arg. 26; Brief for Respondents, at 19-20, 47-48. There is therefore no need for the Court to discuss Sankirtan.
 
 
 49
 452 U.S. at 659, n.3, 101 S.Ct. at 2569, n.3.
 
 
 50
 Justice White, for the Court, observed however:
 
 
 51
 (ISKCON) and its ritual of Sankirtan have no special claim to First Amendment protection as compared to that of other religions who also distribute literature and solicit funds. None of our cases suggest that the inclusion of peripatetic solicitation as part of a church ritual entitles church members to solicitation rights in a public forum superior to those of members of other religious groups that raise money but do not purport to ritualize the process. Nor for present purposes do religious organizations enjoy rights to communicate, distribute, and solicit on the fairgrounds superior to those of other organizations having social, political, or other ideological messages to proselytize.
 
 
 52
 452 U.S. at 652, 101 S.Ct. at 2566.
 
 
 53
 Justice Brennan also said, apparently having in mind the language of the majority opinion:
 
 
 54
 Our cases are clear that governmental regulations which interfere with the exercise of specific religious beliefs or principles should be scrutinized with particular care. See, e.g., Sherbert v. Verner, 374 U.S. 398, 402-403, 10 L.Ed.2d 965, 83 S.Ct. 1790 (1793), (1963). As we stated in Wisconsin v. Yoder, 406 U.S. 205, 220, 32 L.Ed.2d 15, 92 S.Ct. 1526 (1535) (1972), "There are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." I read the Court as accepting these precedents, and merely holding that even if Sankirtan is "conduct protected by the Free Exercise Clause," it is entitled to no greater protection than other forms of expression protected by the First Amendment that are burdened to the same extent.
 
 
 55
 452 U.S. 659-60, n.3, 101 S.Ct. at 2570 n.3.
 
 
 56
 Considering both opinions in Heffron, and especially Justice White's opinion for the Court, Krishna followers have no greater rights to constitutional protections than other solicitors for charitable purposes. We hold, therefore, that the City of Houston may require ISKCON to register, identify its solicitors, and make disclosure reports concerning its solicitation of public funds without facially violating the first amendment.
 
 VI.
 
 57
 There is a relatively recent trend in the courts toward disposing of cases similar to the one before us on overbreadth and vagueness, doctrines that have little to do with the application of the challenged regulation to the plaintiffs themselves.[7] The bars are just short of having been let down on justiciability and standing.[8] We do not question the wisdom or the propriety of the doctrines in the proper case. Indeed, we welcome decisions upholding or tending to fortify the fundamental freedoms of speech and exercise of religion. And there are some cases, Schaumberg for one, where a particular statutory provision is so obviously overbroad that a judgment based on an evidentiary hearing concentrating on the regulation's unconstitutional application to particular plaintiffs would be unnecessary and would not be effective in removing the chilling effect of the statute on fundamental rights. The regulation in this case, however, is not one that we can conscientiously say is so vague or so substantially overbroad that it has a chilling effect on first amendment rights generally. See Broderick v. Oklahoma, 1973, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed. 830. We have found no vagueness in the mandatory duty imposed on the tax assessor-collector to issue certificates of registration to solicitors of charitable purposes, no requirement therefore of Freedman procedural safeguards, no overbreadth, at least as to the information in the registration application and the reporting statements: in sum no facial violation of freedom of speech or of freedom to exercise religion.
 
 
 58
 The current judicial popularity of the overbreadth doctrine does not mean that the "unconstitutional-as-applied" principle has flown out the window in first amendment cases. As Justice Black has said, "the existence of a 'chilling effect' even in the area of First Amendment Rights has never been considered a sufficient basis, in and of itself, for prohibiting state action". Younger v. Harris, 1971, 401 U.S. 37, 51, 91 S.Ct. 746, 754, 27 L.Ed.2d 669. Again, "The power and duty of the judiciary to declare laws unconstitutional are in the final analysis derived from its responsibility for resolving concrete disputes brought before the court for decision.... But this broad responsibility, broad as it is, does not amount to an unlimited power to survey the statute books and pass judgment on laws before the courts are called upon to enforce them". Id. at 52, 91 S.Ct. at 754. Younger v. Harris was a pending criminal prosecution, but Justice Black's quoted observations are applicable to overbreadth cases in which the decision is partly motivated by potential application of a statute to parties not before the court.[9]
 
 
 59
 Our gnawing doubts about the Houston ordinance arise from the visceral feeling that the 1979 amendment erased most of the plaintiffs' objections. The real dispute now is not over the chilling effect of the ordinance on first amendment rights of all solicitors of funds for charitable purposes. It is between ISKCON and the City of Houston over the burdensome application of the ordinance. But we cannot tell whether the so-called "plethora" of information required by the registration and reporting statements is a plethora and undue burden without more facts.
 
 
 60
 There is no doubt that the City of Houston amended the ordinance in 1979, after the original complaint was filed, in a good faith effort to comply with recent decisions in the Supreme Court and with decisions in other courts across the country on regulation of solicitation generally and with regard to the Society particularly. One conspicuous example of the City's sanitizing the ordinance is the elimination of the provision requiring cancellation of the license if the tax assessor-collector ascertains that "more than 25 percent of the funds collected are being used to pay salaries, wages, fees, commissions, expenses and cost of solicitation and collection". § 37-49. Another example, recognized by the trial judge here as a reasonable construction of the ordinance, is the effort to reduce the function of the tax assessor-collector to the performance of purely ministerial duties by taking from him the authority "to evaluate the answers given" in the application for a certificate. We are still left with a large number of requirements with no evidence in the record as to the extent of the burden imposed on an applicant.
 
 
 61
 In the interest of fairness to the City and to the Society we conclude that the case should be remanded for an evidentiary hearing for the trial judge to determine whether the Houston ordinance is unconstitutional as applied to the plaintiffs in the case. At this hearing, the Society should develop facts supporting its allegations, particularly with regard to the extent of the allegedly undue burden it would be compelled to carry to comply with the ordinance. The City should develop facts bearing on its interest in the objectives of the ordinance, on the plaintiffs' contentions, particularly with regard to its assertions as to the reasonableness of the regulatory scheme, and on the lack of effective but less intrusive measures than those adopted in the ordinance. We suggest that as a result of this hearing, the district court, under the savings clause (Section 12), may decide that certain provisions, clauses, or terms may be constitutionally objectionable without destroying the substance of the regulatory scheme.
 
 VII.
 
 62
 We consider it appropriate to discuss briefly some of the plaintiffs' contentions directed at the specific wording of the ordinance.
 
 
 63
 The trial judge concluded: "Vagueness plagues ... (A) the exceptions (§ 37-50); (B) the registration statement (§ 37-43), and (C) the issuance of the Certificate of Registration (§ 37-45)."
 
 
 64
 A. Exceptions. 1. The trial judge found that subsection (1) of § 37-50 excepting "organizations or associations" if they solicit from their own "members" is constitutionally infirm because the terms are not defined. The applicable standard for vagueness is "the practical criterion of fair notice to those to whom the statute is directed. The particular context is all important." American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 412, 70 S.Ct. 674, 690, 94 L.Ed.2d 925; Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960). The terms in question have a common, well-understood meaning sufficiently plain to put on fair notice those subject to the ordinance. For example, the plaintiffs themselves in the stipulation filed in the record referred to ISKCON as a "bona-fide religious organization " and its "members " as engaging in Sankirtan "to attract new members ". There is no doubt, therefore, that the plaintiffs had notice of the meaning of the terms. The trial judge's holding on this point is not bolstered by his statement that the "concept of membership in a religion eludes objective definition." Although the parties agreed in the stipulation that ISKCON was a "religious organization", membership in a religion is not the operative fact requiring registration or excepting the organization when the solicitation is from its own members. The operative fact is solicitation. The elusiveness of the "concept of membership in a religion" has nothing to do with the case.
 
 
 65
 Almost in passing, the plaintiffs argue that subsection 1 of § 37-50 gives a preferred status to the institutionalized practice of religion over uninstitutionalized practice. There is nothing in the record to show what is meant by the terms "institutionalized" and "uninstitutionalized". The preference, if there is a preference, does not rise to the level of a violation of the establishment clause. Krishna followers have a temple in Houston, ordained priests, are guided by their construction of the Bhagavad-gita, a sacred Hindu text as important in the Buddhist religions as the Bible is to Christians and Jews and, as far as the record goes, are members of an institutionalized religion on the same institutional level as many other religions. The exception simply reduces the burden of registration when in most cases compliance with the ordinance would be inappropriate; for example, passing the collection plate in a church or in a temple to Krishna. Members of any organization expect to be solicited for contributions. As everyone knows, this is true both as to secular and purely religious organizations.
 
 
 66
 In Larson v. Valente, 1982, --- U.S. ----, 102 S.Ct. 1673, 72 L.Ed.2d 33, a Minnesota statute on charitable contributions exempted from its registration and reporting sections religious organizations that solicit less than 50 percent of their funds from nonmembers. The Supreme Court held that this exemption granted denominational preference in violation of the Establishment Clause in that it imposed the registration and reporting requirements on some religious organizations but not on others. The legislative history disclosed that the 50 percent rule "was passed in committee for the sole purpose of exempting the (Roman Catholics) archdiocese from the provisions of the Act." Not only that, there was evidence that the rule was intended to deal with certain religious organizations which are soliciting in streets and soliciting by direct mail and, according to one state senator, have "people running around airports". "In short", the Court said, the "express design (was) to burden or favor selected religious denominations". As stated in Lemon v. Kurtzman, 1971, 403 U.S. 602, 620, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745: "This kind of state inspection and evaluation of the religious content of a religious organization is fraught with the sort of entanglement that the constitution forbids".
 
 
 67
 There is no exemption in the Houston ordinance similar to the 50 percent rule in the Minnesota statute. There is no evidence in the record to show a design to reach organizations having "people running around airports" soliciting, although to the extent such solicitation amounts to harassment the purpose would be legitimate. The only relevant legislative history is the inference to be drawn from the 1979 rewrite of the ordinance that the City undertook to enact an even-handed constitutional regulation. Again a weakness shows up in attempting to decide constitutionality in a limited factual context. The Court does not know whether ISKCON solicits its own members. If an exception for solicitation by an organization from own members is indeed the only preference shown to certain religious organizations it is not substantial enough to void the ordinance for violation of the Establishment Clause. Moreover, depending on the facts, it would not be unreasonable to sever the provision establishing that exception or to limit its application.
 
 
 68
 2. The plaintiffs' contention as to subsection (1) shades into their objection to subsection (2) of the exceptions section, exempting from the registration requirements solicitors who solicit "with the permission of the person who owns or controls the premises" where the solicitation occurs. Again the intent was to reduce the burden of registration when, generally, there is no need to protect the persons solicited; for example, one holding a fund-raising meeting in one's home or on premises with the permission of the owner. We consider it captious to contend that failure to define the words "permission" or "owns" renders the exception vague. Conceivably, "controls" standing alone might, by a stretch of the imagination, cause some uncertainty but in context it seems clear enough. The provision would make a reasonable exception for a fund-raising meeting at the home of an owner or a tenant in lawful control of the premises or a meeting on public property with the permission of the proper governing authority.
 
 
 69
 3. Subsection (3) of § 37-50 exempts from the ordinance an announcement or advertisement of the solicitations described in subsections (1) and (2). Subsection (3) is a logical corollary to the two other subsections-as we view them. If passing the collection plate in church or temple does not require registration under the ordinance, the announcement that the next collection will go to the church or temple building fund does not violate the ordinance. There is no governmental interest in restricting the announcement or advertisement of a fund-raising event that is itself beyond the reach of the regulation. This subsection, like the other two in the exceptions section, meets the practical criterion of fair notice to those the ordinance is intended to reach.
 
 
 70
 B. Registration Statement. The trial court found that subsections (3), (5), and (9) of § 37-43, dealing with the information required for the registration statement, "contain terms which are vague, making precise compliance with the registration regulation difficult."
 
 
 71
 1. Subsection (3) requires a "brief description of the person registering, the charitable use which the funds are to be solicited, and an explanation of the intended use of the funds toward that purpose". This provision, the court states, "does not pinpoint what kind of information is desired", and "does not explain the difference, if any exists, between a 'brief description and an explanation', or between 'charitable purpose' and intended 'use' ". We find none of the difficulties that concerned the district court. To the extent this subsection might be considered ambiguous-we do not regard it ambiguous-the latitude allowed an applicant lessens the burden of compliance with the registration requirements.
 
 
 72
 2. Subsection 5 requires the "names ... of all individuals who will be in direct charge or control of the solicitation of funds". This language is objected to on the ground that "exactly whose names the subsection requires is not evident ... the people who planned the solicitation or those who count all the contributions ... the names of the solicitors who will be directly involved with and will control the funds in the field". This criticism goes far indeed to torture plain language. The key words are "in direct charge or control of the solicitation", not in charge or control of the "funds". Section 37-43(4) requires the names of those who disburse the funds and § 37-47 requires the names of the solicitors on the identification cards.
 
 
 73
 3. The trial judge stated in his opinion that Subsection 9 "requests" a "projected schedule of ... expenses" and "an estimated percentage of the total projected collections which the costs of solicitation will comprise". Again he found that "it is not clear what information is required". Continuing, the trial judge states:
 
 
 74
 The percentage figure desired compares the cost of solicitation with the total collections. Yet the subsection also requests (it does not require) the cost of disbursement to be supplied for no apparent reason. A more meaningful figure would be a comparison of the costs of solicitation and disbursement with the total collection. That figure would show the donor how much of his donation actually aids needy people or charitable projects. But in order to obtain the data necessary to ascertain this percentage, the tax assessor-collector would have to read in a requirement that the costs of disbursement be disclosed, rather than construing the provision as a request. Such an interpretation would constitute either a discretionary act by the tax assessor or an act beyond the scope of his power, neither of which are constitutional. Thus, Subsection (9) of § 37-43 is vague.
 
 
 75
 The court's analysis of the subsection is faulty on several counts. First, the language of § 37-43 is mandatory ("persons ... shall file ... an application in writing showing"). There is no basis for the court to interpret § 37-43(5) as requiring information and § 37-43(9) as requesting information-apparently allowing the tax assessor-collector discretion. Second, the court incorrectly stated that the "percentage figures desired compares the cost of solicitation with the total collections". As defined by § 37-43(9), the cost of solicitation encompasses both costs incurred "in connection with the solicitation of funds or in connection with their disbursement." It includes what the District Court termed a "more meaningful figure", i.e., "a comparison of the costs of solicitation and disbursement with the total collection." There is no reason, therefore, to interpret the section as allowing the licensor either to commit "a discretionary act" or to "act beyond the scope of his power". There is no doubt that statutes and regulations affecting first amendment rights must be narrowly drawn and scrutinized for any undue intrusion upon those rights. But that is not a license to call spirits from the vasty deep. And here they do not come.
 
 
 76
 Under the Houston ordinance, an applicant for a certificate of registration makes only a good faith estimate of a "projected schedule" and "estimated percentage" of a projected total to raise estimated "costs of solicitation". It is difficult for this Court to find that such estimates unduly impinge on the plaintiffs' first amendment rights, but an evidentiary hearing will allow them the opportunity to attempt to make that proof.
 
 
 77
 C. We have earlier discussed the alleged vagueness in the provisions of the ordinance dealing with the issuance of a certificate of registration. See section III of this opinion. We hold that the ordinance vests no discretionary authority in the tax assessor-collector.
 
 VIII.
 
 78
 Relying principally on NAACP v. Alabama, 1958, 377 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, the plaintiffs contend that § 37-43(2) and § 37-42(c) of the ordinance have a chilling effect on their first amendment rights of freedom of association and right of privacy; here the two can not be separated. We find no merit to the contention.
 
 
 79
 Section 37-43(2) requires the applicant to disclose the names of its partners, officers, directors, or members (if there are ten or fewer members). Section 37-42(c) makes it "unlawful for an individual to solicit for charitable purposes without visibly displaying an identification card issued by the city tax assessor and collector".
 
 
 80
 NAACP v. Alabama originated in an entirely different context from the context within which this litigation originated. In the course of an injunction action to stop the NAACP from conducting activities in Alabama the state demanded "the names and addresses of all (of the NAACP) members and agents without regard to their positions or functions in the Association". 357 U.S. at 451, 78 S.Ct. at 1166. The Court held that the association's immunity for its membership lists was so related to the rights of privacy and association as to come within the protection of the fourteenth amendment. As the Court pointed out, "Inviolability of privacy in group association may in many cases be indispensable to preservation of freedom of association particularly where a group espouses dissident beliefs .... Petitioner has made an uncontroverted showing that past revelation of the identity of its rank and file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility". 357 U.S. at 462, 78 S.Ct. at 1171.
 
 
 81
 The Houston ordinance does not affect dissident beliefs but only conduct relating to the solicitation of funds from the public, primarily a secular function. There is nothing in the ordinance from which the inference can be drawn that its undisclosed objective was to deter freedom of association or to hamper activities of the Society by reprisal against members whose names would be disclosed. There is no disclosure required except as it specifically relates to the raising of funds from the public. No membership lists are required; no names of contributors are sought; no information is asked about funds raised from members; nothing must be revealed regarding proselytizing of new members. Significantly, too, no dilemma is posed to an organization forcing it to decide whether to remain totally private or, by making public solicitations, reveal publicly all aspects of its operations. The internal operations of the organization, apart from its public solicitation, remain under the veil of privacy. All that is mandated is disclosure to the public about those funds which are solicited from the public.
 
 
 82
 The district court cites two First Circuit cases declaring unconstitutional ordinances requiring certain individuals to wear identifying badges. In Strasser v. Doorley, 1970, 432 F.2d 567 an ordinance required bootblacks and newsboys to wear metal badges on their hats. In Wulp v. Corcoran, 1972, 454 F.2d 826 the ordinance required newspaper vendors to obtain a permit from a licensing board with discretionary power and to wear an official badge. But in neither case could the defendant point to a governmental interest of any importance that would be served by identification and in each case the Court was concerned with the right to distribute printed material. It was in connection with this right that the Court in Wulp quoted Talley v. California, 1960, 362 U.S. 60, 64, 80 S.Ct. 536, 538, 4 L.Ed.2d 559 that printed materials distributed anonymously "have played an important role in the progress of mankind". Wulp v. Corcoran and Strasser v. Doorley do not purport to overrule an earlier case in which the First Circuit, relying on Cantwell, upheld the requirement of identification badges for religious solicitors. City of Manchester v. Leiby, 1941, 117 F.2d 661.
 
 
 83
 The district judge was of two minds with regard to visible identification of solicitors. He stated:
 
 
 84
 It is difficult to assess the impact Houston's mandatory disclosure of membership or municipally compelled visible identification would have on the plaintiffs. Disclosure of membership or officers might inhibit some people from becoming members of a religious association or from becoming officers of the organization. Similarly, mandatory wearing of an identification card might inhibit people from soliciting and it might stigmatize the solicitors. However, an identification card also might assist them in disseminating their ideas and literature, and in collecting money. Strangers might be more willing to open their doors or stop on the street to talk with a person who has a visible identification card which shows only that the solicitor's group has registered with the city. The public might feel protected against fraud and the solicitors might enjoy great public approval and receptivity.
 
 
 85
 At first reading, his solution seems reasonable as to most solicitors:
 
 
 86
 Yet, the benefits of identification might be achieved without the potentially stigmatizing effect of compelled visible identification. Solicitors could be required to carry identification cards and to display them to potential donors upon request, or to supply the donor with the same information which is contained on the identification card. If the solicitor wished to wear the card, he could.
 
 
 87
 We cannot, however, find any stigma attached to a solicitor displaying the innocuous identification card prescribed under the Houston ordinance.[10] Indeed, the card is an insignificant means of identification when carried by a solicitor in a safron robe with his hair arranged in the distinctive manner characteristic of Krishna followers. If a visible identification card is a stigma, there are millions of Americans attending conventions and soliciting for traditional charitable organizations who do not realize that they are tainted.
 
 VIII.
 
 88
 We note with interest that in Fernandes v. Limmer counsel for the defendants during oral argument asked the court "for detailed guidance in drafting constitutionally sound regulations in this delicate area". 663 F.2d at 626. The court, of course, properly responded: "(A)s an Article III court, our legislative impulses must be constrained by the scope of the controversy before us and a deferential respect for our limited judicial role". Id. It is not beyond our competence, however, to suggest, with deference, that the City of Houston, might consider simplifying Article IV of its Code of Ordinances consistent with maintaining its compelling governmental interest in protecting its citizens from fraud and harassment too often found in the solicitation of funds from the public for charitable and religious purposes.
 
 
 89
 The judgment of the district court is reversed. The judgment granting the plaintiffs a permanent injunction and attorneys' fees and costs is vacated. The case is remanded for an evidentiary hearing consistent with this opinion.
 
 APPENDIX
 ORDINANCE
 No. 79-829
 
 90
 AN ORDINANCE AMENDING SECTIONS 37-41, 37-42, 37-43, 37-44, 37-45, 37-46, 37-47, 37-48, 37-49, 37-50 OF THE CODE OF ORDINANCES OF THE CITY OF HOUSTON; ESTABLISHING REGISTRATION REQUIREMENTS FOR PERSONS SOLICITING FUNDS FOR CHARITABLE PURPOSES; PRESCRIBING CERTAIN CRIMINAL PENALTIES; MAKING OTHER PROVISIONS RELATIVE THERETO; REPEALING ALL PRIOR INCONSISTENT PROVISIONS; PROVIDING A SEVERABILITY CLAUSE; AND DECLARING AN EMERGENCY.
 
 
 91
 BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF HOUSTON:
 
 
 92
 Section 1. That Section 37-41 of the Code of Ordinances, Houston, Texas, is hereby amended to read as follows:
 
 
 93
 "Section 37-41.
 
 
 94
 (a) The term 'solicit funds' or 'solicitation of funds' shall mean any request for the donation of money, property, or anything of value, or the pledge of a future donation of money, property, or anything of value; or the selling or offering for sale of any property, real or personal, tangible or intangible, whether of value or not, including, but not limited to, goods, books, pamphlets, tickets, publications or subscriptions to publications, or brochures, upon the representation, express or implied, that the proceeds of such sale will be used for a charitable purpose as such term is herein defined. Expressly excluded from the meaning of 'solicit funds' or 'solicitation of funds' is any offer of membership in any organization. A solicitation of funds is complete when the solicitation is communicated to any individual then located within the corporate limits of the city.
 
 
 95
 (b)(1) The term 'charitable purpose' shall mean philanthropic, religious or other non-profit objectives, including the benefit of poor, needy, sick, refugee or handicapped persons; the benefit of any church or religious society, sect, group or order; the benefit of a patriotic or veterans' association or organization; the benefit of any fraternal, social or civic organization, or the benefit of any educational institution.
 
 
 96
 (b)(2) The term 'charitable purpose' shall not be construed to include the direct benefit of the individual making the solicitation.
 
 
 97
 (b)(3) The term 'charitable purpose' shall not be construed to include the benefit of any political group or political organization which is subject to financial disclosure under state or federal law.
 
 
 98
 (c) The term 'person' shall mean and include any natural person, firm, partnership, corporation or association.
 
 
 99
 (d) The term 'individual' shall mean only a natural person."
 
 
 100
 Section 2. That Section 37-42 of the Code of Ordinances, Houston, Texas, is hereby amended to read as follows:
 
 
 101
 "Section 37-42. Unlawful solicitation.
 
 
 102
 (a) It shall be unlawful for any person, directly or through an agent or employee, to solicit funds for charitable purposes within the corporate limits of the city unless such person shall have first obtained a certificate of registration from the city tax assessor and collector, as hereinafter provided.
 
 
 103
 (b) It shall be unlawful for any individual, as the agent or employee of another, to solicit funds for charitable purposes in the city unless his principal or employer has received a certificate of registration as hereinafter provided.
 
 
 104
 (c) It shall be unlawful for an individual to solicit for charitable purposes without visibly displaying an identification card issued to that individual by the city tax assessor and collector, as hereinafter provided.
 
 
 105
 (d) It shall be unlawful for any person to alter an identification card issued by the City Tax Assessor and Collector, without the express approval thereof.
 
 
 106
 (e) It shall be unlawful for an individual to solicit for charitable purposes while displaying an identification card issued by the City Tax Assessor and Collector in the name of another individual.
 
 
 107
 (f) It shall be unlawful to solicit for charitable purposes between the hours of 10:00 p.m. and 6:00 a.m.
 
 
 108
 (g) It shall be unlawful for any person, directly or through an agent or employee, to solicit funds for charitable purposes within the corporate limits of the city after the expiration of any certificate of registration issued as hereinafter provided.
 
 
 109
 (h) It shall be unlawful for the person registering or the agents or employees thereof to solicit funds for a charitable purpose other than that set out in the registration statement upon which the certificate of registration was issued.
 
 
 110
 (i) It shall be unlawful for any person who shall solicit funds for charitable purposes in the city to represent in connection with such solicitation of funds that the issuance of a certificate of registration or an identification card by the city constitutes an endorsement or approval of the purposes of such solicitation of funds by the city or any officer or employee thereof.
 
 
 111
 (j) It shall be unlawful for any person issued a certificate of registration hereunder to fail to file with the city tax assessor and collector within thirty (30) days from the expiration of the certificate of registration a sworn financial statement, as provided in section 37-48, showing the total amount collected from the solicitation of funds and the amounts and purpose for which such funds were disbursed."
 
 
 112
 Section 3. That Section 37-43 of the Code of Ordinances is hereby amended to read as follows:
 
 
 113
 "Section 37-43. Registration Statement
 
 
 114
 All persons desiring to solicit funds for charitable purposes in the city shall file with the city tax assessor and collector a registration statement, on forms provided by the tax assessor and collector, containing the following information:
 
 
 115
 (1) The name of the person registering and desiring to solicit funds for charitable purposes.
 
 
 116
 (2) Whether the person registering is a natural person, partnership, corporation or association and,
 
 
 117
 (a) If a natural person, the business or residence address and telephone number must be given.
 
 
 118
 (b) If a partnership, the names of all partners and the principal business address and telephone number of each partner must be given.
 
 
 119
 (c) If a corporation, the person registering must state whether it is organized under the laws of Texas or is a foreign corporation, and must show the mailing address, business location, telephone number, name of the individual in charge of the Houston office of such corporation, and the names of all officers and directors or trustees of said corporation, and, if a foreign corporation, the place of incorporation.
 
 
 120
 (d) If an association, the registration statement shall show the association's principal business address and telephone number, if any, and shall show names and principal business or residence addresses and telephone numbers of all members of the association unless they exceed ten (10) in number, in which case the application shall so state and the person registering may alternatively list the names and principal business or residence addresses and telephone numbers of the officers and directors or trustees of the association. If the association is part of a multi-state organization or association, the mailing address and business location of its central office shall be given, in addition to the mailing address and business location of its local office.
 
 
 121
 (3) A brief description of the person registering, the charitable purpose for which the funds are to be solicited, and an explanation of the intended use of the funds toward that purpose.
 
 
 122
 (4) The names of all individuals authorized to disburse the proceeds of the solicitation.
 
 
 123
 (5) The names, mailing address and telephone number of all individuals who will be in direct charge or control of the solicitation of funds.
 
 
 124
 (6) The time period within which the solicitation of funds is to be made, giving the date of the beginning of solicitation and its projected conclusion.
 
 
 125
 (7) A description of the methods and means by which the solicitation of funds is to be accomplished.
 
 
 126
 (8) The total amount of funds proposed to be raised.
 
 
 127
 (9) A projected schedule of salaries, wages, fees, commissions, expenses and costs to be expended and paid in connection with the solicitation of funds or in connection with their disbursement, and an estimated percentage of the total projected collections which the costs of solicitation will comprise.
 
 
 128
 (10) The names of any other cities in which the person registering has solicited funds for charitable purposes within the past five (5) years, but in the event that the person registering has solicited funds for charitable purposes in more than ten (10) other cities, the person registering may list the ten (10) cities in which the most recent solicitations occurred.
 
 
 129
 (11) A statement to the effect that if a Certificate of Registration is granted, such Certificate will not be used as or represented to be an endorsement by the City or any of its officers or employees.
 
 
 130
 (12) The names of any officer, director, trustee, partner, or any current agent or employee engaging in solicitation of funds who has been convicted of a felony or a misdemeanor involving moral turpitude within the past seven (7) years, and the nature of the offense, the State where the conviction occurred, and the year of such conviction.
 
 
 131
 (13) An explanation of the reasons, if the person registering is unable to provide any of the foregoing information, why such information is not available.
 
 
 132
 (14) The registration statement must be signed by the applicant, if the person registering is an individual; if the person registering is a partnership, by the partner charged with disbursing funds solicited; if a person registering is a corporation or an association, by its officer charged with disbursing the funds solicited. The individual signing the registration statement shall sign the statement and swear before an officer authorized to administer oaths that he has carefully read the registration statement and that all the information contained therein is true and correct."
 
 
 133
 Section 4. That Section 37-44 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 134
 "Section 37-44. Registration FeeEvery registration statement shall be accompanied by a registration fee of five dollars ($5.00) to compensate the City for the cost of administering this article, and such fee will not be refunded if a Certificate of Registration is not issued."
 
 
 135
 Section 5. That Section 37-45 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 136
 "Section 37-45. Issuance of Certificate of Registration.
 
 
 137
 After a review of the registration statement to determine its compliance with Section 37-43 above, and, within ten (10) working days of the receipt of the registration statement, the City Tax Assessor and Collector shall either issue a Certificate of Registration, as provided in Section 37-47, or notify the person registering that the registration statement does not comply with the requirements of Section 37-43 above and specifically point out what information or explanation has not been furnished that is required before a Certificate of Registration can be issued."
 
 
 138
 Section 6. That Section 37-46 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 139
 "Section 37-46. Form of Certificate of Registration.
 
 
 140
 The City Tax Assessor and Collector shall prescribe the form of the Certificate of Registration. However, each such Certificate of Registration shall be printed in black except that the following shall be printed prominently thereon in red: 'The issuance of this Certificate of Registration is not an endorsement by the City of Houston or any of its officers or employees.' Each Certificate of Registration shall bear a registration number which is the same as the file containing the registration statement filed by the registrant."
 
 
 141
 Section 7. That Section 37-47 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 142
 "Section 37-47. Solicitors' Identification Cards
 
 
 143
 The City Tax Assessor and Collector shall prescribe the form for identification cards for solicitors. However, each such identification card shall bear the name of the person registering, the registration number, the name of the solicitor or agent, the expiration date of the Certificate of Registration, and it shall have printed prominently thereon in red: 'This identification card is not an endorsement of the solicitation by the City of Houston or any of its officers or employees.'
 
 
 144
 The person registering shall provide, by a separate list, the names and addresses of all agents or employees for whom identification cards are desired. The City Tax Assessor and Collector shall issue up to ten (10) identification cards with the Certificate of Registration without any additional charge. The registrant may obtain additional identification cards by paying to the City its actual cost."
 
 
 145
 Section 8. That Section 37-48 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 146
 "Section 37-48. Expiration of The Certificate of Registration; Filing of Financial Statement within Specified Time of Termination of Solicitation
 
 
 147
 Every Certificate of Registration and Identification Card issued by the Tax Assessor-Collector shall expire at the termination of the solicitation period specified in the registration statement or one (1) year from the date of issuance, whichever is less.
 
 
 148
 Not later than thirty (30) days from the expiration of the Certificate of Registration, the person registering shall file with the City Tax Assessor-Collector, on forms provided thereby, a closing statement regarding the solicitation of funds, which shall be a sworn financial statement showing the total funds collected from the solicitation of funds and the purpose and amount for which such funds were disbursed by the person registering and any incurred but unpaid expenses resulting from the solicitation of funds."
 
 
 149
 Section 9. That Section 37-49 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:"Section 37-49. Public Disclosure
 
 
 150
 All registration statements filed with the City Tax Assessor and Collector, whether or not a Certificate of Registration has been issued, shall be a public record and shall be available for inspection by members of the public during regular business hours and copies may be obtained at the regular cost fixed in Section 2.20.1 of this Code of Ordinances."
 
 
 151
 Section 10. That Section 37-50 of the Code of Ordinances, Houston, Texas is hereby amended to read as follows:
 
 
 152
 "Section 37-50. Exceptions
 
 
 153
 The following are excepted from the operation of Sections 37-41 through 37-49:
 
 
 154
 (1) The solicitation of funds for charitable purposes by any organization or association from its members;
 
 
 155
 (2) The solicitation of funds for charitable purposes by a person when such solicitation occurs on premises owned or controlled by the person soliciting funds or with the permission of the person who owns or controls the premises.
 
 
 156
 (3) The issuance of any announcement or advertisement that such solicitation as described in subsections (1) and (2) above will occur or which announces or advertises an event at which unannounced solicitation as described in subsections (1) and (2) above occurs."
 
 
 157
 Section 11. All provisions of Section 37-41 through Section 37-50 of the Code of Ordinances, Houston, Texas existing prior to the enactment of this ordinance are hereby expressly repealed.
 
 
 158
 Section 12. If any provision, section, subsection sentence, clause or phrase of this ordinance, or the application of same to any person or set of circumstances is for any reason held to be unconstitutional, void or invalid, the validity of the remaining portions of this ordinance or their application to other persons or sets of circumstances shall not be affected thereby, it being the intent of the City Council in adopting this ordinance that no portion thereof or provision, or regulation contained herein, shall become inoperative or fail by reason of any unconstitutionality of any other portion hereof and all provisions of this ordinance are declared to be severable for that purpose.
 
 
 159
 Section 13. There exists a public emergency requiring that this ordinance be passed finally on the date of its introduction, and the Mayor having in writing declared the existence of such emergency and requested such passage, this ordinance shall be passed finally on the date of its introduction, this 16th day of May, 1979, and shall take effect immediately upon its passage and approval by the Mayor.
 
 
 160
 PASSED this 16th day of May, A.D., 1979.
 
 
 161
 APPROVED this 16th day of May, A.D., 1979.
 
 
 162
 /s/ JIM McCONN
 
 
 163
 /s/ Mayor Of The City Of Houston
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 Rakay and Sugarman, A Reconsideration of the Religious Exemption: The Need for Financial Disclosure of Religious Fund Raising and Solicitation Practices, 9 Loy.U.L.Jour. 663 (1978)
 
 
 [2]
 The cases are collected in Heffron v. International Society for Krishna Consciousness, Inc., 1981, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed. 298. See also United States v. Silberman, 464 F.Supp. 866, 872 (M.D.Fla.1979)
 
 
 [3]
 Jim McConn, Mayor of Houston, Harry Caldwell, Chief of Police, and Earl J. Martin, City Tax Assessor-Collector
 
 
 [4]
 Sec. 37-45. Granting or refusing license
 The city tax assessor and collector shall examine the application and make such investigation as he may deem necessary to ascertain the truth of the facts and information set out therein, and said city tax assessor and collector shall refuse to issue a license in the following instances:
 (a) Where any statement made in such application is false, fraudulent or untrue.
 (b) Where any applicant shall fail or refuse to furnish in such application all of the information required under section 37-43 of this article.
 (c) Where it appears that more than twenty-five per cent (25%) of the funds to be collected are to be used to pay salaries, wages, fees, commission, expenses and costs of solicitation and collection.
 Except as hereinbefore provided, all persons who comply fully and in good faith with all of the provisions of this article shall be entitled as a matter of course to the issuance of a license or permit as provided for herein, and the said tax assessor and collector shall have and exercise no discretion as to whether or not the purpose for which the license is requested is a bona fide charitable or welfare purpose; provided however, that it shall be unlawful and a violation of this article for any person to solicit funds or anything of value for any purpose which is not in fact a valid, legitimate and bona fide charitable or welfare purpose, and the fact that such person may have procured the license provided for herein shall not affect, justify or excuse such unlawful solicitation. (Ord. No. 69-1436, § 1, 7-30-69)
 
 
 [5]
 Section 4A(b) provides that the application "shall state: ... (7) Such other pertinent information found to be necessary by the designated official (the Executive Director of the Dallas-Fort Worth Regional Airport) to adequately enforce the terms of this Resolution"
 Section 4A(c) provides:
 (c) REASONS FOR REFUSAL OF PERMIT: The application shall be granted and the Permit shall issue unless one or more of the following facts is found to exist:
 (1) that one or more of the statements in the Application is not true;
 (2) that the Applicant or any agent or representative of the Applicant who will participate under the Permit is presently or has been engaged in a fraudulent transaction or enterprise, or has been convicted of a felony or other criminal offense involving moral turpitude;
 (3) that the expected cost of solicitation will be excessive in relation to the gross amount to be collected. Any such cost of solicitation in excess of twenty-five (25%) percent of the total amount collected shall be considered and presumed to be unreasonable, but this presumption may be rebutted by Applicant upon good cause shown. Cost of solicitation shall include any money or thing of value not reserved specifically and entirely to assist, aid or further the announced charitable cause. All accounting and bookkeeping records, government reports, all tax records for the preceding two years, and any other relevant papers or documents with reference to the Charitable Solicitation may be examined and audited either at the time of application, during the solicitation, or at or after the expiration of the Permit;
 (4) when there is good reason to believe that the granting of the Permit will result in a direct and immediate danger or hazard to the public security, health, safety or welfare;
 (5) when the Applicant or any agent or representative of the Applicant who will participate under the Permit has previously violated any portion of the Code of Rules and Regulations of the Dallas-Fort Worth Regional Airport Board, or has violated any of the terms and provisions of any prior Permit.
 
 
 [6]
 Cf. the language of the Supreme Court in the recent case, Larson v. Valente, 1982, --- U.S. ----, 102 S.Ct. 1673, 72 L.Ed.2d 33, 50:
 Appellants assert, and we acknowledge, that the State of Minnesota has a significant interest in protecting its citizens from abusive practices in the solicitation of funds for charity, and that this interest retains importance when the solicitation is conducted by a religious organization. We thus agree with the Court of Appeals, 637 F.2d (562), at 567, that the Act "viewed as a whole, has a valid secular purpose," and we will therefore assume arguendo that the Act generally is addressed to a sufficiently "compelling" governmental interest. But our inquiry must focus more narrowly, upon the distinctions drawn by § 309.515-1(b) itself: Appellants must demonstrate that the challenged fifty per cent rule is closely fitted to further the interest that it assertedly serves.
 
 
 [7]
 See Gunther, Cases and Materials on Constitutional Law 1185-1195 (1980); Tribe, American Constitutional Law, §§ 12-35, 36, p. 732-36 (1978); Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 44 (1970); Note, "The Chilling Effect in Constitutional Law", 69 Colum.L.Rev. 808 (1969)
 
 
 [8]
 See generally, Note, Standing to Assert Constitutional Jus Terti, 88 Harv.L.Rev. 423 (1974)
 
 
 [9]
 See Gunther, Cases and Materials on Constitutional Law, 1189-90 (1980)
 
 
 [10]
 The card reads: