885 F.2d 1225
 TELCO COMMUNICATIONS, INC., Plaintiff-Appellee,
v.
S. Mason CARBAUGH, as he is Commissioner of the Department
of Agriculture and Consumer Services of the
Commonwealth of Virginia, Defendant-Appellant,
State of Connecticut; State of Maryland; State of North
Carolina; State of West Virginia, Amici Curiae,
Virginia State Lodge, Fraternal Order of Police, Amicus Curiae.
 No. 88-2668.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 11, 1989.
Decided Sept. 20, 1989.
 
 Guy Winston Horsley, Jr., Frank Seales, Jr., Sr. Asst. Atty. Gen., Edward Paul Nolde, Asst. Atty. Gen., Richmond, Va. (Mary Sue Terry, Atty. Gen., Stuart, Va., H. Lane Kneedler, Chief Deputy Atty. Gen., Gail Starling Marshall, Deputy Atty. Gen., Nashville, Tenn., on brief), for defendant-appellant.
 Peter Sanderson Brooks (Brooks & Brooks, Sherborn, Mass., John G. Douglass, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., Louis J. Scerra, Jr., and Goldstein & Manello, Boston, Mass., on brief), for plaintiff-appellee. (Clarine Nardi Riddle, Acting Atty. Gen., David E. Ormstedt, Asst. Atty. Gen., Lacy H. Thornburg, Pittsboro, N.C., J. Joseph Curran, Jr., Attys. Gen., James G. Klair, Asst. Atty. Gen., Baltimore, Md., and Ken Heckler, Secretary of State of West Virginia, on brief), for amici curiae, Connecticut, Maryland, North Carolina and West Virginia.
 Errol Copilevitz, John P. Jennings, Jr., Copilevitz, Bryant, Gray & Jennings, P.C., Kansas City, Mo., Kevin R. Huennekens, Maloney, Yeatts & Barr, Richmond, Va., on brief, for amicus curiae, Virginia State Lodge, Fraternal Order of Police.
 Before HALL and WILKINSON, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.
 WILKINSON, Circuit Judge:
 
 
 1
 In this case we must determine if four provisions of the Virginia charitable solicitation laws, Va.Code Ann. Secs. 57-48 et seq., are constitutional. The first provision states that a professional solicitor must disclose to potential donors the percentage amount of a contribution that will go to the charitable organization for its own use. Va.Code Ann. Sec. 57-55.1. The second requires professional solicitors to disclose in writing to potential donors that their financial statements for the last fiscal year are available from the Virginia Office of Consumer Affairs. Id. at Sec. 57-55.2. The third provision mandates that a solicitor file with the Office of Consumer Affairs a copy of the script of any oral solicitation at least ten days prior to the commencement of the solicitation campaign. Id. at Sec. 57-61 D. Finally, Sec. 57-61.1 B of the Virginia Code permits the Commissioner of the Office of Consumer Services to suspend or revoke the registration of a solicitor if certain provisions of the Act are violated.
 
 
 2
 The district court held that each of the four challenged provisions impermissibly infringed on First Amendment freedoms. Telco Communications, Inc. v. Carbaugh, 700 F.Supp. 294 (E.D.Va.1988). We find Telco's challenge to the percentage disclosure requirement to be moot. We likewise find the challenge to the suspension and revocation provisions in Sec. 57-61.1 B non-justiciable. We affirm the district court with respect to the prior submission of solicitation scripts. We reverse, however, with regard to the required disclosure of financial statements on file with the state.
 
 I.
 
 3
 Plaintiff Telco Communications, Inc. is engaged in the business of providing fund raising services to police organizations and fire fighter unions. Plaintiff publishes a series of handbooks relating to public health and safety. Topics for the handbooks have included drug and alcohol abuse awareness and crime prevention. The client on whose behalf Telco conducts a fund raising campaign receives a percentage of the gross advertising revenue of these handbooks, and Telco is responsible for the preparation, printing, and distribution of the handbooks. Plaintiff contracted with local police fraternal organizations in the Commonwealth of Virginia to publish and distribute a pamphlet on their behalf and to solicit advertisements for the publication.
 
 
 4
 Following a complaint that Telco had violated Virginia solicitation laws, the Virginia Office of Consumer Affairs (OCA) advised plaintiff in March 1988, that it was investigating plaintiff's fund raising activities in Virginia. Thereafter, on June 3, 1988, OCA informed plaintiff's attorneys of the specific violations which Telco had allegedly committed and invited plaintiff to an informal fact-finding conference. The conference was held on July 6, 1988. No resolution of the charges was reached, however, and OCA continued its investigation.
 
 
 5
 On July 21, 1988, Telco filed suit in the Eastern District of Virginia seeking to enjoin the OCA from enforcing certain provisions of the Virginia charitable solicitation laws. Count I of the complaint alleged that four provisions of the Virginia charitable solicitation laws, see Va.Code Ann. Secs. 57-55.1; 57-55.2; 57-61 D; 57-61.1 B and C, infringed on Telco's rights to free speech, in violation of the First and Fourteenth Amendments. Count II was a pendent state claim alleging that the charitable solicitation provisions at issue did not apply to plaintiff's operations.
 
 
 6
 Through a motion for summary judgment, defendant Mason Carbaugh, Commissioner of the Department of Agriculture and Consumer Services of the Commonwealth of Virginia, requested the district court to abstain from exercising jurisdiction because of the ongoing state administrative proceedings against Telco. The district court denied defendant's motion.
 
 
 7
 On September 26, 1988, plaintiff moved for partial summary judgment on Count I of its complaint. Defendant cross-moved for partial summary judgment. After oral argument the district court granted summary judgment in Telco's favor on all issues raised in Count I. Telco Communications, Inc. v. Carbaugh, 700 F.Supp. 294 (E.D.Va.1988). Plaintiff then stipulated to a dismissal without prejudice of Count II.
 
 
 8
 Defendant appeals.
 
 II.
 
 9
 The Commonwealth contends the district court should have abstained from hearing Telco's constitutional claims. It asserts that administrative proceedings had been instituted against Telco on June 3, 1988, by a letter to Telco's attorneys specifying violations of state law and inviting them to attend a fact-finding conference. Since such procedures were still pending when Telco filed suit on July 21, 1988, it argues that abstention was proper. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). We hold, however, that the district court did not err in declining to abstain where state proceedings were in a preliminary stage and where the state had imposed a prior restraint upon protected speech.
 
 
 10
 Abstention is the exception, "not the rule." Colorado River Water Conservation District v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976); Cox v. Planning Dist. I Community Mental Health and Mental Retardation Services Bd., 669 F.2d 940, 942 (4th Cir.1982). Under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts should abstain "whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 237-38, 104 S.Ct. 2321, 2328, 81 L.Ed.2d 186 (1984); Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 432-37, 102 S.Ct. 2515, 2521-24, 73 L.Ed.2d 116 (1982). Important to Younger abstention is the existence of an ongoing state proceeding. If such a proceeding exists, "reinstituting the action in the federal courts" is impermissible; indeed to do so would involve a loss of time and duplication of effort. Wulp v. Corcoran, 454 F.2d 826, 831 (1st Cir.1972). If no state proceeding is pending, however, a federal action may be permissible because it guarantees a party which has violated state law "a chance for ultimate vindication of constitutional claims." Id. If the ongoing state proceeding is "judicial in nature," Younger abstention plainly applies. Middlesex, 457 U.S. at 433-34, 102 S.Ct. at 2522. Administrative proceedings are not judicial in nature, however, if state law expressly indicates that the proceeding is not a judicial proceeding or part of one, Midkiff, 467 U.S. at 238-39, 104 S.Ct. at 2328-29, or if the proceeding lacks trial-like trappings.
 
 
 11
 Here Telco's action did not disrupt any ongoing state proceeding. Upon learning that the OCA was investigating its activities in Virginia, Telco requested a meeting with OCA. After several months, an "informal fact-finding conference" was held on July 6, 1988. The OCA, however, never initiated a formal hearing in conformance with the Commonwealth's Administrative Process Act, Va.Code Ann. Sec. 9-6.14:1 et seq. Nor did the OCA request a formal prosecution against Telco. An informal conference need not be followed by the institution of formal proceedings. See Va.Code Ann. Sec. 9-6.14:12. As such, it is not indicative of whether administrative proceedings will continue. While Telco's filing of the federal action on July 21, 1988, may or may not have led the state to refrain from filing formal charges, that in no way diminishes the uncertain prospects that plaintiff was facing. Indeed, after learning of the investigation of its activities, Telco had to wait months before any meaningful response to its request for a meeting with state officials was received.
 
 
 12
 Likewise, the July 6 meeting with those officials was not remotely "judicial in nature." Only Telco, the OCA, and their respective counsel participated at the meeting. The participants were not sworn nor was a record maintained. No opportunity was provided to examine or cross-examine. The meeting was simply a settlement conference to see if the dispute could be consensually resolved. The Virginia Administrative Process Act carefully distinguishes between informal and formal proceedings. Only at the latter are the safeguards of subpoenas of witnesses, cross-examination, and an impartial hearing officer provided. See Va.Code Ann. Secs. 9-6.14:12; 9-6.14:13; 9-6.14:14.1.
 
 
 13
 Recent cases applying Younger abstention support this conclusion. In each of them, the court abstained from exercising jurisdiction because of the existence of formal, ongoing state proceedings. In Ohio Civil Rights Commission v. Dayton Christian Schools, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), for example, the Supreme Court found abstention proper because the subject of an administrative complaint brought suit in federal court after the Ohio Civil Rights Commission had initiated formal administrative proceedings. In Middlesex County Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982), the Court abstained where it found an attorney, prior to the commencement of the federal action, had received a formal statement of charges from the ethics committee and was required to file an answer within ten days. This circuit, in Simopoulos v. Virginia State Board of Medicine, 644 F.2d 321 (4th Cir.1981), moreover, found abstention appropriate because a state criminal proceeding was underway before the plaintiff initiated his federal action. Finally, in American Civil Liberties Union v. Bozardt, 539 F.2d 340 (4th Cir.1976), the court did not entertain jurisdiction because a bar disciplinary complaint had been filed.
 
 
 14
 Younger abstention represents an accommodation between a state's pursuit of important interests in its own forum and the federal interest in federal adjudication of federal rights. We decline to hold that Younger abstention is required whenever a state bureaucracy has initiated contact with a putative federal plaintiff. Where no formal enforcement action has been undertaken, any disruption of state process will be slight. While important state interests are present in connection with this or any state statute, the strength of those interests will be respected by any court assessing a plaintiff's constitutional claims. Appellant's contention--that abstention is required whenever enforcement is threatened--would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it. Wulp, 454 F.2d at 831. A federal plaintiff would be placed "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity in order to avoid becoming enmeshed" in enforcement proceedings. Steffel v. Thompson, 415 U.S. 452, 462, 94 S.Ct. 1209, 1217, 39 L.Ed.2d 505 (1974). The prospect of such prolonged uncertainty cannot but chill a party's First Amendment freedoms. See Zwickler v. Koota, 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). See also Houston v. Hill, 482 U.S. 451, 467, 107 S.Ct. 2502, 2512-13, 96 L.Ed.2d 398 (1987) (Court "particularly reluctant to abstain in cases involving facial challenges based on the First Amendment"). We hold, therefore, that the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court. Indeed, if this time is never appropriate, any opportunity for federal adjudication of federal rights will be lost.[1]
 
 
 15
 It is this last point that underscores our disagreement with the dissenting opinion which steadfastly insists that this is not a First Amendment case. The dissenting opinion holds that Younger abstention is flatly compelled whenever the administrative process is even preliminarily underway. No matter how egregious the state's infringement of constitutional rights or how incipient the stage of administrative proceedings, the dissent would mandate abstention. This converts a doctrine of comity into a blanket permission for the prolonged commission of unconstitutional acts. It would allow any state agency to persist in conduct that is patently unconstitutional. In this case, as we shall show in section IIIC, infra, the state agency was engaged in a prior restraint of protected speech. The dissent, in its insistence upon Younger abstention, offers no defense of the state's practice; nor is there one. Absent from the dissenting opinion is an appreciation for the role of federal courts in protecting from plain constitutional infringement the rights and liberties of citizens who properly invoke their jurisdiction. Younger itself recognized a role for the court in such cases. The doctrine has always involved some interplay between concepts of comity and the need for protection of constitutional rights. Younger, 401 U.S. at 44, 91 S.Ct. at 750.
 
 
 16
 We do not hold as a general matter that district courts are justified in entertaining jurisdiction simply because state proceedings have not reached a more formal stage. The doctrine of Younger abstention has progressed over the past two decades to protect state criminal proceedings, Younger, 401 U.S. 37, 91 S.Ct. at 747, state civil cases, Juidice v. Vail, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), and state administrative process, Dayton, 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), from premature federal interference. To follow the doctrine, however, as one would a pied piper, is to forsake the Supreme Court's rulings on constitutional rights. We hold that the district court did not err in entertaining jurisdiction in the face of the clear constitutional violation in this case.
 
 III.
 
 17
 "[C]haritable solicitations are so intertwined with speech that they are entitled to the protections of the First Amendment." Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 959, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984). See also Riley v. National Federation of the Blind of N.C., --- U.S. ----, 108 S.Ct. 2667, 2672-73, 101 L.Ed.2d 669 (1988). Charitable solicitations inform the public about the charity's existence and goals. A donor's contribution in response "to a request for funds functions as a general expression of support" for the charity and its purposes. Cornelius v. NAACP Legal Defense and Educational Fund, 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). First Amendment protections extend as well to the paid professional solicitor: "a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak." Riley, 108 S.Ct. at 2680. While "soliciting financial support is undoubtedly subject to reasonable regulation," Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 632, 100 S.Ct. 826, 833-34, 63 L.Ed.2d 73 (1980), such regulation must not unduly intrude upon the rights of free speech. Id. at 637, 100 S.Ct. at 836. That is, the state bears the burden of showing that its regulation is narrowly tailored to further a strong, subordinating interest that the state is entitled to protect. Munson, 467 U.S. at 960-61, 104 S.Ct. at 2848-49; Village of Schaumburg, 444 U.S. at 637, 100 S.Ct. at 836.
 
 
 18
 The district court held that the four challenged provisions of the Virginia charitable solicitation laws impermissibly infringed on Telco's First Amendment rights. We address the challenged provisions in turn.
 
 A.
 
 19
 Section 57-55.1 of the Virginia Code provides that a professional solicitor must disclose to potential donors the percentage of their contribution which will be received by the charitable organization for its own use:
 
 
 20
 It shall be a violation of this chapter for a professional solicitor to solicit contributions from a potential donor in this Commonwealth without clearly and conspicuously disclosing to the potential donor prior to orally requesting a contribution, or contemporaneously with a written request for a contribution, at the point of solicitation, the minimum percentage of any amount contributed which will be received by the charitable or civic organization for its own use.
 
 
 21
 Telco's challenge to the constitutionality of this section is moot.
 
 
 22
 "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969); Commonwealth of Virginia v. Califano, 631 F.2d 324, 326 (4th Cir.1980). Generally, the "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case." United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Jurisdiction, however, may abate if there is no reasonable expectation that the alleged violation will recur and "interim events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); Califano, 631 F.2d at 326.
 
 
 23
 Here no reasonable expectation exists that Virginia will seek to enforce the statute. Subsequent to Riley v. National Federation of the Blind of N.C., --- U.S. ----, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), where the Supreme Court struck down a North Carolina statute similar to Sec. 57-55.1, the OCA has not threatened Telco or any other professional solicitor with any action for violation of Sec. 57-55.1. OCA, moreover, has not asserted its right to enforce Sec. 57-55.1 at any future time. In effect, OCA has conceded the unconstitutionality of the statute. While Telco points to a July 14, 1988, letter from the Attorney General as an indication that Riley will not affect the OCA's Sec. 57-55.1 charges, that letter noted only that Riley will not affect the charges in the June 3, 1988 letter--a letter which omitted any mention of Sec. 57-55.1. The only OCA letters mentioning Sec. 57-55.1 were sent in March, 1988, prior to the Supreme Court's Riley decision.
 
 
 24
 We believe that respect for the role of the states and for the limits of the federal adjudicative function to live cases and controversies counsels against the issuance of unnecessary injunctions against state officials. "To slap injunctions on state officials who have never violated the law or shown any intention to violate the law would exceed the proper bounds of equitable discretion." Bloodgood v. Garraghty, 783 F.2d 470, 476 (4th Cir.1986). State officials have shown no inclination to enforce this statute since Riley and we decline to indulge any presumption with respect to their conduct other than one of good faith.
 
 B.
 
 25
 Virginia Code Sec. 57-55.2 requires professional solicitors to disclose in writing that financial statements for the last fiscal year are available from the Virginia Office of Consumer Affairs. It provides:
 
 
 26
 Every professional solicitor who solicits contributions from a prospective contributor in this Commonwealth: ... (iii) shall further disclose, in writing, the fact that a financial statement for the last fiscal year is available from the State Office of Consumer Affairs.
 
 
 27
 The OCA argues that this section promotes the Commonwealth's interest in public education regarding charitable organizations and prevents fraud and harassment. It contends also that the requirement is narrowly tailored to further such interests. We agree.
 
 
 28
 Informing the public, see Village of Schaumburg, 444 U.S. at 637-38, 100 S.Ct. at 836-37; International Society for Krishna Consciousness v. City of Houston, Texas, 689 F.2d 541, 547-48 (5th Cir.1982), and preventing fraud, see Riley, 108 S.Ct. at 2676; Village of Schaumburg, 444 U.S. at 636-37, 100 S.Ct. at 836, are substantial state interests, both fostered by Sec. 57-55.2. While there are distinct limits on the extent to which private entities may be enlisted by the state in this educative function, Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the state interest in adding to the public knowledge of professional solicitations is not one that is inherently incompatible with the First Amendment. The requirement of Sec. 57-55.2 educates the public generally about the availability of financial information on solicitors. It informs a donor that information on the soliciting entity is available from the OCA, and that, by implication, information about other solicitors is also available. The information contained in the financial statements, moreover, is invaluable. A donor can use this information to determine if a particular solicitation is bona fide by ascertaining whether the solicitor is registered. A donor might also use this information to learn further about a solicitor's operations. Additionally, this section assists in preventing fraud. When comparative information is available, inaccuracies in inducements are less likely to occur. If they do occur, they are more likely to be discovered.
 
 
 29
 Section 57-55.2, moreover, is narrowly tailored. The statute requires that the disclosure be made in writing to prospective contributors. With respect to written solicitations, a brief notation of this nature is not a burdensome requirement. With respect to oral solicitations, such as those conducted by Telco, the requirement of a written disclosure can be easily met through notation on the donor's receipt. Because the donation will have already been made in such a case, the disclosure will discourage donations only if donors read that financial statements are available and then stop payment on their checks--an unlikely event. Finally, while Telco suggests the state could accomplish its purposes by publishing the information itself, the requirement that the disclosure be made to charitable contributors is tailored to that group which would most desire the information and make an informed decision on the basis of it.
 
 
 30
 In Meese v. Keene, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987), a member of the California State Senate challenged as unconstitutional the Foreign Agents Registration Act, 22 U.S.C. Secs. 611 et seq., which required several Canadian documentary films to carry the label "political propaganda" along with a standard form disclosure about the availability from the government of reports about the films. The Court upheld both the "political propaganda" label and the standard form disclosures, noting that "[d]isseminators of propaganda may go beyond the disclosures required by statute and add any further information they think germane to the public's viewing of the materials." Id. at 481, 107 S.Ct. at 1871. While the dissent objected to use of the label "political propaganda," it did not object to the standard form disclosure, and even argued that this truly neutral instruction was a sufficient alternative to the objectionable term. Id. at 494, 107 S.Ct. at 1878 (Blackmun, J., dissenting). Section 57-55.2 simply requires a similar, neutral disclosure about the availability of reports from the government. It affords "more speech" to the public, but does not silence the solicitor. See generally, Id. at 481, 107 S.Ct. at 1871, quoting Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 649, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).
 
 
 31
 Riley is also instructive. Unlike the compelled disclosure of the percentage collected that will go to a charity struck down in Riley, the brief, bland, and non-pejorative disclosure required here is unlikely to discourage donations. Moreover, unlike the percentage donation requirement which the Riley Court indicated might have an unequal effect upon campaigns "with high costs and expenses," 108 S.Ct. at 2679, Va.Code Ann. Sec. 57-55.2 is a boilerplate requirement which will affect all solicitors equally. Finally, the Riley Court explicitly approved a requirement that a solicitor disclose to potential donors his professional status, including his employer's name and address, a neutral requirement similar to Sec. 57-55.2. 108 S.Ct. at 2679 n. 11.
 
 
 32
 Telco's receipt stated the following: "A financial statement can be obtained by contacting the Office of Consumer Affairs Division in Richmond." Requiring such a statement is a permissible exercise of state authority, and we reverse the judgment of the district court to the contrary.
 
 C.
 
 33
 Section 57-61 D requires solicitors to submit the script of an oral solicitation to the Commissioner at least ten days prior to the commencement of solicitation. It provides that:
 
 
 34
 At least ten days prior to the commencement of each solicitation campaign, the solicitor shall file with the Commissioner a copy of the contract entered into with any charitable or civic organization and shall file a completed 'Solicitation Notice' on forms prescribed by the Commissioner.... Copies of all campaign solicitation literature, including the text of any solicitation to be made orally, shall be attached to the Solicitation Notice. The charitable or civic organization on whose behalf the solicitor is acting shall certify that the Solicitation Notice and accompanying materials are true and complete.
 
 
 35
 The OCA contends that this section promotes the state's interest in the prevention of fraud and misrepresentation in solicitation. Moreover, OCA argues that this requirement is the only effective regulation of telephone solicitation and is not unduly burdensome. We, however, find Sec. 57-61 D an unconstitutional prior restraint.
 
 
 36
 "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." Nebraska Press Ass'n. v. Stuart, 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). A threat of criminal or civil sanctions chills speech, but a "prior restraint 'freezes' it at least for the time." Id., quoting A. Bickel, The Morality of Consent 61 (1975). Any system of prior restraints of expression thus bears "a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).
 
 
 37
 The Commonwealth fails to carry this "heavy burden." Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971). Although the Commonwealth has a legitimate interest in preventing fraud and misrepresentation, there is a thin line between reviewing a script for misrepresentations and reviewing it for content. Section 57-61 D provides no guidelines for OCA review and thus permits OCA officials to recast solicitation scripts so as to reflect their judgment as to how a solicitation can be made. Without guidelines, unpopular or controversial organizations may be subject to stricter scrutiny. Moreover, the requirement might dissuade some organizations from soliciting in Virginia, see Riley, 108 S.Ct. at 2676, and discourage others from submitting scripts which, although accurate, may risk the displeasure of state officials.
 
 
 38
 While Sec. 57-61 D may be the most effective means of monitoring telephone solicitation, "the First Amendment does not permit the State to sacrifice speech for efficiency." Riley, 108 S.Ct. at 2676; Village of Schaumburg, 444 U.S. at 639, 100 S.Ct. at 837; Schneider v. State, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). Potential donors may be protected against fraud and misrepresentation by vigorous enforcement of the Commonwealth's anti-fraud and misrepresentation statutes. Riley, 108 S.Ct. at 2676. Notification that a fundraiser's financial statements are available, as required by Sec. 57-55.2, will facilitate the Commonwealth's enforcement of these provisions by ensuring that donors are aware of and have the opportunity to use comparative information. Such enforcement "punish[es] the few who abuse rights of speech after they break the law" rather than "throttle them and all others beforehand." Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (emphasis in original).
 
 
 39
 Appellant contends that the practical application of this section is not burdensome: that the Commissioner does not review the script for content but only checks for potential misrepresentations; that the Commissioner relies only on his powers of persuasion to get a solicitor to alter a possible misrepresentation; that the Commissioner tolerates deviations from the script; that the Commissioner does not absolutely require a script (but only an outline), and that the maximum period of approval for scripts is ten days and is often much shorter.
 
 
 40
 None of these assurances, however, persuades us that bureaucratic review of solicitation scripts is not rife with the potential for abuse. The Commissioner's power to suspend or revoke a license under Sec. 57-61.1 B provides him substantial leverage over charitable solicitations. While the OCA may only "request" script alterations before approval is given to begin solicitations, the practical effect of such a "request" is likely to go beyond persuasion. In fact, the record suggests a solicitor has never refused such a request. Scripts, moreover, are required. A "solicitation notice" must be filed with the OCA, and a copy of all solicitation literature and the text of any solicitation to be made orally must be attached to the solicitation notice. Va.Code Ann. Sec. 57-61 D. Finally, an OCA representative testified that a script is required and if none exists, the solicitor must reduce to writing the proposed set presentation. Monitoring devices, such as that in Va.Code Ann. Sec. 57-61 D, are a powerful inducement toward orthodox presentation of charitable solicitations--a result which the variety in character of charitable organizations belies and which the commitment to diverse expression in the First Amendment forbids.
 
 
 41
 Appellant's reliance on Times Film Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), is misplaced. Although Times Film upheld an ordinance requiring the prior submission of motion pictures to a censorship board, the Supreme Court substantially modified this decision so as to permit the prior submission of motion pictures only if there are adequate procedural safeguards, which are conspicuously absent here. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).
 
 
 42
 Appellant also relies on Shapero v. Kentucky Bar Association, 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988), which permits states to require lawyers to file a copy of solicitation letters with a state agency. Shapero, however, has no application to restrictions on charitable solicitations. Unlike charitable solicitations, solicitation by lawyers is commercial speech, Ohralik v. Ohio State Bar Association, 436 U.S. 447, 455-56, 98 S.Ct. 1912, 1918-19, 56 L.Ed.2d 444 (1978), and hence not subject to the exacting scrutiny required here.
 
 D.
 
 43
 Section 57-61.1 B of the Virginia Code permits the Commissioner of the Office of Consumer Services to suspend or revoke the registration of a solicitor if certain provisions of the Act are violated. It provides:
 
 
 44
 If the Commissioner at any time determines that (i) the requirements of Sec. 57-49 or Sec. 57-61 have not been met, or (ii) the registrant has violated, within the preceding twelve months, any requirement of Secs. 57-54, 57-55.2 or 57-57 or any regulations adopted pursuant to 57-66, then the Commissioner may suspend or revoke the registration by a written case decision made in conformance with the Administrative Process Act (Sec. 9-6.14:1 et seq.)
 
 
 45
 Telco contends that Sec. 57-61.1 B operates as a prior restraint upon speech by permitting the state to silence charitable speech on the basis of violations, either unrelated to speech or of minimal consequence. The Commonwealth, on the other hand, asserts that Sec. 57-61.1 B embodies its entire scheme of regulatory enforcement without which it would be left helpless to sanction widespread fraud and abuse. In the abstract, these are both powerful contentions. We find the records and pleadings inadequate, however, to determine the precise operation of Sec. 57-61.1 B in this case and therefore dismiss plaintiff's claim. Likewise, Sec. 57-61.1 C, which sets forth the procedures by which the sanctions are applied, was not discussed by the parties and need not be addressed in this case.
 
 
 46
 Jurisdiction should only be exercised when "the case 'tenders the underlying constitutional issues in clean-cut and concrete form.' " Socialist Labor Party v. Gilligan, 406 U.S. 583, 588, 92 S.Ct. 1716, 1719, 32 L.Ed.2d 317 (1972), quoting Rescue Army v. Municipal Court, 331 U.S. 549, 584, 67 S.Ct. 1409, 1427, 91 L.Ed. 1666 (1947). See also Keystone Bituminous Coal Ass'n. v. DeBenedictis, 480 U.S. 470, 494-95, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); Hodel v. Virginia Surface Mining & Reclamation Ass'n., 452 U.S. 264, 294-95, 101 S.Ct. 2352, 2369-70, 69 L.Ed.2d 1 (1981). Here, "we know very little more about the operation of the [Virginia procedure] as a result of this lawsuit than we would if a prospective plaintiff who had never set foot in [Virginia] had simply picked this" off the statute books and filed this lawsuit. Gilligan, 406 U.S. at 588, 92 S.Ct. at 1719. While some grounds for suspension or revocation may be permissible, others may not. Uneven enforcement of sanctions for trivial reasons might implicate First Amendment concerns; sanctions for gross fraud would not. The state and district courts have also taken divergent views of the statute's meaning--views which might bear upon the section's constitutionality. The state, for example, contends that the maximum period of revocation pursuant to Sec. 57-61.1 B is 12 months, while the district court notes that this section does not "limit revocation to a period of only 12 months." To permit state courts to construe this state statute may therefore prove useful. See Rescue Army, 331 U.S. at 584, 67 S.Ct. at 1427. In short, while Telco may meet the minimal requirements of standing, and may be a party to a case or controversy, its case "has not given any particularity" to the effect upon it of Sec. 57-61.1 B. Gilligan, 406 U.S. at 588, 92 S.Ct. at 1719.
 
 
 47
 As can readily be seen from the cross-references in Sec. 57-61.1 B, the sanctions challenged in this section also cover a spectrum of activities, from the filing of a registration statement with the Commonwealth to the misleading of the public with regard to the status of the solicitor. The sanctions, however, have never been applied to Telco. We have no idea whether Telco has violated, or is accused of violating, any of the underlying provisions to which the sanctions would apply. The record is so sparse and the challenge to this section so generalized as to give it all the earmarks of unripeness. We do not, on this account, foreclose facial challenges to state statutes in federal court. We do, however, require that the party bringing such a challenge present a more particularized view as to the impact of the challenged provision upon its own activities.
 
 
 48
 The dissent maintains that Younger abstention would have been a more appropriate means of avoiding premature adjudication. We disagree. It would have been improper for the district court to abstain from the case entirely to avoid discrete issues not yet ripe for review. The Article III doctrines of justiciability do serve, however, as a supplementary guarantee that federal courts will not engage in premature interference with state proceedings. Indeed, there is nothing to prevent the state from pursuing the proceedings against Telco free of the singular constitutional taint of the prior restraint.
 
 IV.
 
 49
 In summary, we find Telco's challenge to the percentage disclosure requirement in Va.Code Ann. Sec. 57-55.1 to be moot. Likewise, we find no justiciable controversy with respect to the suspension and revocation requirements in Va.Code Ann. Sec. 57-61.1 B and C. We thus vacate the judgment of the district court and remand with directions to dismiss without prejudice this section of plaintiff's complaint. We hold that Va.Code Ann. Sec. 57-55.2, which requires notification to potential donors of financial statements on file with the state, is a permissible exercise of Virginia's power to regulate professional solicitations. We thus reverse the judgment of the district court as to this claim. Finally, we affirm the district court's judgment that the submission of solicitation scripts required by Va.Code Ann. Sec. 57-61.1 D is an unconstitutional prior restraint upon First Amendment freedoms.
 
 
 50
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 51
 The majority believes that this is a First Amendment case. It is not. The majority believes that "we must determine" the constitutionality of several provisions of Virginia's charitable solicitation laws. Op. p. 1227. We do not. As a matter of comity, we must not. This is an abstention case. It is about federal-state relations in our system of government and a proper respect for the important role of informal procedures in the administrative process. Because the majority fails to recognize that we must abstain, I respectfully dissent.
 
 I.
 
 52
 As the majority points out, the doctrine of Younger abstention stands as an exception to the rule that federal courts must decide cases within their jurisdiction. Op. at 1228; see also New Orleans Public Service, Inc. v. Council of City of New Orleans, --- U.S. ----, 109 S.Ct. 2506, 2512-13, 105 L.Ed.2d 298 (1989). However, this doctrine also stands in recognition of the important considerations of comity and respect for state government that are so fundamental to our federal system. Younger v. Harris, 401 U.S. 37, 43-45, 91 S.Ct. 746, 750-51, 27 L.Ed.2d 669 (1971) (known as "Our Federalism"). Thus, Younger abstention serves as a mechanism to reconcile two competing policy considerations--the federal courts duty to respect ongoing state proceedings and their mission to ensure that federal rights are vindicated. Op. p. 1229. When these two considerations come into conflict, as they do in this case, Younger routinely requires that federal courts must abstain:
 
 
 53
 Because of our concerns for comity and federalism, we thought that it was "perfectly natural for our cases to repeat time and time again that the normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions.
 
 
 54
 Ohio Civ. Rights Comm. v. Dayton Christian Schools, Inc., 477 U.S. 619, 627, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986) (emphasis in original, citation omitted). As Dayton itself held, the same considerations are controlling for requests to enjoin ongoing administrative proceedings. As long as administrative litigants are given an opportunity to raise their constitutional concerns, the respect accorded to state administrative proceedings must be similar to that given to state court proceedings. It is easy to see why this is so. States must be left free to enforce their laws either administratively or judicially as they see fit. Any other result would undermine the very foundations of Younger:
 
 
 55
 a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.
 
 
 56
 Younger, 401 U.S. at 44, 91 S.Ct. at 750, cited in City of New Orleans, 109 S.Ct. at 2516. Thus, although abstention is an exception to the general rule that federal courts must exercise their jurisdiction, Younger and its progeny require that ongoing state administrative proceedings be given deference by the federal courts.
 
 II.
 
 57
 In Middlesex Co. Ethics Committee v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982), the Supreme Court fashioned a threefold inquiry to determine when abstention is necessary:
 
 
 58
 first, do [the state proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges.
 
 
 59
 (emphasis in original). As applied to this case, I believe that the majority would agree with me that the last two prongs of the inquiry have been met. Virginia's interest in protecting its citizenry from fraud through administratively enforced charitable solicitation laws is certainly important. Op. p. 1231. Likewise, Telco's opportunity to raise its constitutional concerns both before OCA and on direct appeal in the Virginia Commonwealth courts (pursuant to Va.Code Ann. Secs. 9-6.14:16, 57-67) clearly satisfies the third prong. See Middlesex, 457 U.S. at 436, 102 S.Ct. at 2523; Dayton, 477 U.S. at 629, 106 S.Ct. at 2723. Thus, we are in disagreement only as to whether there is an ongoing state proceeding to which we should defer and whether that proceeding is sufficiently "judicial" in nature to merit abstention.[1] I address these issues in turn.A.
 
 
 60
 "Ongoing" means "being actually in process" or "continuously moving forward." Webster's New Collegiate Dictionary, 802 (5th Ed.1977). Here, there can be no question that OCA enforcement proceeding was actually in process prior to Telco's filing in district court. The facts surrounding this proceeding conclusively prove this point.
 
 
 61
 After receiving a complaint about Telco's operation, OCA began an investigation in late March, 1988. On June 3, at the request of Telco, OCA sent a four-page letter to Telco's counsel which detailed the nature of the alleged violations under investigation, as well as the dates and particular solicitation campaigns during which they supposedly occurred. The letter concluded by proposing that an informal fact-finding conference be held to resolve the allegations. A separate cover letter advised Telco of the purpose of the proposed conference. On July 6, an unsuccessful conference was held. Afterwards, OCA continued its enforcement activities by requesting, through counsel, certain Telco records. As it became clear that OCA was about to instigate formal revocation proceedings, Telco filed this action in federal court on July 21. At that time, OCA ceased its enforcement efforts pending its request to the district court to abstain. This request was denied.
 
 
 62
 The majority seems to base its conclusion that there was not an ongoing proceeding on the fact that OCA had not yet commenced a formal revocation hearing. Such a freeze-frame perspective of OCA enforcement, however, ignores the reality of administrative process.
 
 
 63
 Suspension or revocation of a solicitor's registration under Va.Code Ann. Sec. 57-61.1 is accomplished through the procedures of the Virginia Administrative Process Act ("APA") Va.Code Ann. Sec. 9-6.14:1 et seq. After a complaint is filed with and investigated by OCA, an informal fact-finding conference is held between the agency and the suspect registrant. Va.Code Ann. Sec. 9-6.14:11. If this conference does not produce a consensual resolution of the problem, a formal, trial-like proceeding is convened to decide the dispute. Sec. 9-6.14:12. Thus, APA contemplates a two-step decision-making procedure in which the informal conference plays an integral role. The conference serves as a mechanism through which an agency can use its persuasive power to resolve a dispute quickly and inexpensively, obviating the need for a formal hearing. The Virginia General Assembly clearly intended as much.
 
 
 64
 The Revisor's Notes to Sec. 9-6.14:11 sketch the fact-finding conference's place in the administrative process:
 
 
 65
 They [informal conferences] account for by far the greater bulk of administrative operations of a regulatory nature. To exclude them would be to ignore the larger part of the subject. To prevent or seem to prevent them would radically alter, if not disastrously impair, an important tool of today's governance....
 
 
 66
 But, while this section is designed as the primary provision respecting case decisions where basic laws do not require an agency hearing, it may also serve, in the discretion of agencies concerned and upon consent of the private parties, as a preliminary or pretrial method of settling or simplifying cases in which there is a statutory right to a trial-like agency hearing.
 
 
 67
 Thus, it is evident that these conferences are an important step in APA process as well as in OCA's scheme of enforcement. Consequently, to hold that no state enforcement proceeding is ongoing after one of these pretrial conferences has been held, makes no sense. Under the majority's reasoning, only if a formal hearing were scheduled would there be an ongoing proceeding. This view completely ignores the continuous nature of administrative proceedings and disregards this "important tool" of Virginia governance. While in some situations it may be difficult to determine when a case is "ongoing" before a state administrative agency, I have no trouble in concluding that after this enforcement proceeding progressed past the informal conference stage, it was ongoing for Younger abstention purposes. The case law on point supports this conclusion.
 
 
 68
 The majority's contention that Dayton and Middlesex support its determination that there was no ongoing state proceeding has been soundly rejected by another circuit. In University Club v. City of New York, 842 F.2d 37 (2d Cir.1988), the New York City Human Rights Commission was sued by two of the City's private clubs. The Commission had begun an investigation into alleged discriminatory practices at several private clubs. In January, 1986, the Commission filed a complaint against two of the clubs which initiated a formal investigatory period. This investigation culminated in a probable cause determination in July, 1986, at which time the Commission sought to schedule a conciliation meeting. In the meantime, several months earlier in March, the federal plaintiffs filed suit to enjoin the pending administrative proceedings. Id. at 39. In finding abstention the only appropriate course, the Second Circuit saw no conflict with Middlesex and found its case and Dayton indistinguishable:
 
 
 69
 In both cases the administrative posture was the same: the commissions were proceeding with conciliation efforts and adjudication of the charges, when the targets of the investigations brought suit in federal district court to halt the administrative actions because of alleged infringement of constitutional rights.
 
 
 70
 Id. at 40. The court had little trouble in concluding that a state proceeding was ongoing. It reasoned that "the administrative agency in this case has not yet conducted its formal hearing or imposed any sanctions; hence, an ongoing state proceeding exists." Id. at 40 (citation omitted). This is the exact, common sense reasoning that should control this case.
 
 
 71
 Not only has the majority's decision brought us in conflict with the Second Circuit, but it is clearly at odds with one of our own prior decisions. In American Civil Liberties Union v. Bozardt, 539 F.2d 340 (4th Cir.), cert. denied, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976), we upheld a district court's decision to abstain from enjoining the Board of Commissioners on Grievances and Discipline of the South Carolina Bar from investigating a complaint filed against one of the state's attorneys. There, the federal plaintiff filed her suit at the investigation stage of the proceedings, long before any formal hearing was held. Id. at 342. We held then, as I would hold now, that "principles of comity and federalism require that the federal courts not be permitted to interfere in the ongoing state proceedings." Id. We emphasized that the plaintiff's opportunity to have her constitutional challenges addressed in state court (and eventually in the United States Supreme Court) justified the decision to abstain. Id.
 
 
 72
 The reasoning of these cases squarely controls this case, especially in regard to the majority's assertion that these proceedings have not advanced far enough to merit federal deference. Here, a complaint was filed with OCA months before this federal action was filed and the agency had investigated the complaint and had held an informal fact-finding conference. The proceedings in University Club and Bozardt had not progressed nearly as far and both courts found abstention necessary. I would do the same.
 
 
 73
 Most importantly, and most unfortunately, the majority's decision has the practical effect of eviscerating OCA's ability to efficiently enforce Virginia's charitable solicitation laws. Now, if the agency wants to retain jurisdiction to investigate and enforce the Commonwealth's laws, to avoid the potential of federal interference it will likely skip the cost-effective informal conference stage of the state's administrative process and go straight to a formal hearing. This unfortunate result seems to flow from the district court's and the majority's misconception that Telco was a party caught in limbo awaiting an arbitrary state agency's decision whether or not to prosecute. Nothing could have been further from the truth. The decision to prosecute had been made and this was an ongoing enforcement action which was proceeding at a respectable pace.[2] But for Telco's request to enjoin that prosecution, it is undisputed that the second stage of the APA enforcement process, formal proceedings, would have been held. Telco has attempted to, and has apparently succeeded in, making an end-run around the state administrative process and into the federal courts. This is just the type of disruption of ongoing state administrative proceedings that a developed sense of comity cannot allow.
 
 B.
 
 74
 The majority's failure to recognize the continuous nature of administrative process leads it to a second erroneous conclusion, that OCA's proceeding was not "judicial" in character. By focusing on the procedures of the informal fact-finding conference alone, it ignores the fact that the conference is only the first step of a two-part enforcement scheme which culminates in a formal trial-like hearing that even the majority would find "judicial."[3] However, the majority's conclusion is flawed in another, equally fundamental, respect. By requiring the presence of formal, trial-like procedures before a proceeding can be considered "judicial," the majority again fails to recognize administrative reality.
 
 
 75
 As Middlesex and Dayton made clear, state administrative proceedings can be sufficiently "judicial" in nature to warrant Younger abstention. Middlesex, 457 U.S. at 432-34, 102 S.Ct. at 2521-22; Dayton, 477 U.S. at 627, 106 S.Ct. at 2722. In neither case did the Supreme Court make its conclusion dependant on the presence or absence of formal procedural trappings.[4] In Middlesex, the court did not scrutinize the procedures used by the local bar District Ethics Committees. The fact that the agency had or had not gotten to the formal hearing stage was irrelevant because "[f]rom the very beginning a disciplinary proceeding is judicial in nature, initiated by filing a complaint." Id., 457 U.S. at 433, 102 S.Ct. at 2522 (citation omitted). Thus, filing of the complaint was the controlling factor for abstention purposes in Middlesex; an act which occurred months before Telco filed this suit. In Dayton, the court stressed the fact of eventual state court review in concluding that the Ohio Civil Rights Commission proceedings were judicial. Id., 477 U.S. at 619-20, 106 S.Ct. at 2718-19. In the case at bar, Telco unquestionably has the opportunity for the Virginia Commonwealth courts to review its claims.
 
 
 76
 Thus, although I think that it is wrong to analyze it as such, even the informal fact-finding conference standing alone, divorced from the second step of the APA process, is a judicial proceeding worthy of our abstention. Unquestionably, the entire APA process of which this conference is only a part is a judicial undertaking. In sum, I think that the OCA's enforcement proceedings were ongoing at the time Telco filed this suit and were "judicial" in nature for purposes of Younger abstention.[5]
 
 III.
 
 77
 Having determined that OCA's enforcement effort was an ongoing judicial proceeding for purposes of Younger, I believe that both the district court and the panel erred in not abstaining from the case. I would reverse on this point and would not reach the merits of this appeal. Consequently, I do not express any opinion on the majority's First Amendment analysis other than to make one observation.
 
 
 78
 It seems to me that the mootness and ripeness problems encountered by the majority are a direct consequence of taking this case before judicial review was appropriate. If the majority would have abstained, the Virginia courts would not face the problem of determining whether the challenge to Sec. 57-55.1 is actually moot and which of the suspension and revocation provisions of 57-61.1 B are constitutionally suspect. This is so because the Virginia courts would have had before them a fully-developed administrative record that would reveal exactly how the revocation provisions were applied and whether or not OCA relied upon Sec. 57-55.1. Thus, the best argument for Younger abstention is the most obvious. This case is simply not ready for judicial review.
 
 
 79
 A sense of respect for Virginia's right to administratively enforce its laws, and a sense of awareness of the importance of informal procedures in the administrative process demand that we abstain in this case. Accordingly, I would reverse the district court and remand with instructions to abstain until the culmination of the administrative process and any subsequent Commonwealth court appellate review. Because the majority has not chosen this course, I respectfully dissent.
 
 
 
 [1]
 While there may be some theoretical concern that a state would prematurely institute formal enforcement proceedings in order to retain state jurisdiction, this danger has always been inherent in Younger 's requirement of abstention in the face of an ongoing state proceeding. The natural advantages to both parties of amicable settlements, however, operates as a disincentive both to federal suits and to premature formal enforcement on the part of the state
 If, however, one is disposed to posit dangers from the timing of Younger abstention, then the danger of requiring abstention at the onset of informal contacts is that plaintiffs may rush to federal court before seeking to settle a case.
 
 
 [1]
 Telco has not argued and the record does not show the presence of any of the exceptions to Younger abstention, such as bad faith or harassment on the part of OCA. Further, contrary to the majority's protestations, these statutes are not plainly unconstitutional so that abstention is unnecessary. The Younger court itself carved such an exception to its rule of abstention, but it did so very narrowly:
 It is of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it. Id. 401 U.S. at 54-55, 91 S.Ct. at 755, quoting Watson v. Buck, 313 U.S. 387, 402, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941) (emphasis added).
 One need look no further than the majority's holding on the merits to see that the Younger doctrine does apply in this case.
 
 
 [2]
 This is also why there was no "chilling effect" to Telco's First Amendment rights. Regardless, even if Telco's First Amendment rights were slightly chilled, this is certainly not enough to justify federal intervention. Younger, 401 U.S. at 50-51, 91 S.Ct. at 753-54
 
 
 [3]
 The majority also ignores the many procedural safeguards that informal fact-finding conferences have--notice of the conference, right to appear in person or by counsel, notice of all adverse information in possession of the agency, and a prompt decision made in writing if adverse to the litigant. Va.Code Ann. Sec. 9-6.14:12
 
 
 [4]
 This lack of emphasis on procedure is no accident. The Supreme Court has not employed such an analysis for very obvious and very persuasive reasons. In the interest of efficiency and economy, administrative agencies frequently make "judicial decisions," without employing formal legal procedures. The majority's opinion would undermine the benefits of administrative efficiency and lead to increased formalism by not according informal agency actions the deference they are due. It will also lead to an erosion of the deference due to the administrative workings of Virginia's sovereign Commonwealth government
 
 
 [5]
 The Dayton court did allude to two situations where abstention in favor of state administrative proceedings might not be appropriate; neither is applicable here. The first is if state law expressly indicates that the proceedings are not "judicial in nature." A variant of this exception was recently found controlling in City of New Orleans, where the Supreme Court found abstention inappropriate when a plaintiff sought to enjoin an agency's rate-making proceedings--a clearly legislative (rule-making) act. Id., 109 S.Ct. at 2519-2520. Here, the Revisor's Note to Sec. 9-6.14:11 plainly states that the provision is concerned with the "judicial" operations of agencies. The second exception is if the proceedings are remedial rather than coercive in nature. Of course, these enforcement proceedings, which were intended to revoke or suspend Telco's registration if violations were proven, were coercive. See University Club, 842 F.2d at 42 (potential of civil penalties makes proceeding coercive)